No. 40,593

In the Matter of the Appeal of General Motors Corporation, from a Final Order of the State Commission of Revenue and Taxation of the State of Kansas, in Its Docket No. 14,815, Assessing Compensating (Use) Tax Against Said Corporation for the Period from November 1, 1947, through October 31, 1951. GENERAL MOTORS CORPORATION, a Corporation, *Appellee*, THE UNITED STATES OF AMERICA, *Appellee*, v. THE STATE COMMISSION OF REVENUE AND TAXATION OF THE STATE OF KANSAS, *Appellant*.

(320 P. 2d 807)

Opinion filed January 25, 1958.

*Clarence J. Malone*, of Topeka, and *Frank G. Theis*, of Arkansas City, argued the cause and were on the briefs for the appellant.

*Willard N. Van Slyck, Jr.*, of Topeka, and *Edward M. Boddington, Jr.*, of Kansas City, argued the cause, and *Clayton E. Kline, M. F. Cosgrove, Robert E. Russell, William B. McElhenny, O. R. Stites, Jr.*, and *James L. Grimes, Jr.*, all of Topeka, and *Edward M. Boddington* and *J. O. Emerson*, of Kansas City, were with them on the briefs for General Motors Corporation, a corporation, appellee.

*H. Eugene Heine, Jr.*, Department of Justice, Washington, D. C., argued the cause, and *Charles K. Rice*, Assistant Attorney General, *A. F. Prescott* and *John J. Crown*, Department of Justice, Washington, D. C., and *William C. Farmer*, United States Attorney and *Milton P. Beach*, Assistant United States Attorney, were with him on the briefs for the United States of America, appellee.

The opinion of the court was delivered by

PRICE, J.: This appeal arises under the Kansas compensating tax law (G. S. 1949, 79-3701, *et seq.*) commonly referred to as the "use" tax.

The State Commission of Revenue and Taxation (hereafter referred to as the commission) sustained an assessment of compensating (use) tax in the amount of $25,446.53 against General Motors Corporation (hereafter referred to as the corporation). The dispute involves purchases of material and equipment from vendors outside the state between January and October 31, 1951, such purchases having been made pursuant to a contract between the corporation and the United States of America (hereafter referred to as the government). The corporation appealed to the district court and the government was allowed to intervene.

The district court reversed, vacated and set aside the assessment and the commission has appealed.

In rendering judgment the court made findings of fact and conclusions of law as follow:

"FINDINGS OF FACT.

"1. This is a statutory proceeding brought to review a final order of the State Commission of Revenue and Taxation sustaining an assessment of Kansas Compensating (use) taxes made by the Director of Revenue against General Motors Corporation for the period from November 1, 1947, through October 31, 1951, in the amount of $25,446.53.

"2. The taxes in question arise as a result of purchases of machinery and other equipment made outside of the State of Kansas and brought into the State for use in connection with the manufacture of military airplanes.

"3. In the early part of 1951 the United States and General Motors entered into two (2) contracts: (1) General Motors was to fabricate a number of airplanes for the United States, and this item is not a matter of controversy. (2) The United States was to furnish General Motors, rent free, all necessary equipment to enable General Motors to fabricate these airplanes, and the suit before the Court arises out of this contract known as 'Facilities Contract.'

"4. January 17, 1951, the 'Facilities Contract' so called was executed and became a part of a 'Definitive Contract' dated July 21, 1952, and made retroactive to the 1951 date, both documents being among the exhibits of General Motors.

"5. No tax was levied by the State of Kansas on the use of equipment acquired by General Motors from the United States' stock pile of machinery, but only on the use of that coming to the General Motors through purchase by General Motors, as directed by the contract hereinabove referred to.

"6. Purchases by General Motors were made upon authorization of United States officers in charge, at the plant of General Motors, transported on U. S.

Government bills of lading, received at the Kansas City, Kansas, plant of General Motors, immediately tagged as being 'property of the U. S. A. F.,' and records prepared showing equipment as Government owned. The equipment was paid for from General Motors' funds, and reimbursement made by the United States to General Motors promptly on receipt of General Motors' voucher therefor.

"7. The United States controlled all equipment, could divert from General Motors to other plants, could divert from some other plant to General Motors, and this, while equipment was in transit, or after delivery to General Motors.

"8. The equipment in the General Motors' plant, used in the programme, was not listed on General Motors' books as part of its assets, no depreciation or amortization taken thereon, and no insurance carried.

"9. The equipment involved was purchased outside Kansas, and became U. S. property immediately after purchase; General Motors exercised no claim of ownership to said equipment, and at no time owned same.

"Conclusions of Law.

"1. The United States was the purchaser of the tangible personal property in question, and was vested with full ownership thereof.

"2. The United States was the 'user, storer or consumer' of the property at the time said property was used, stored or consumed in the State of Kansas, within the meaning of the Kansas Compensating Tax Act.

"3. General Motors Corporation's use of the property was merely in the capacity of a bailee in whose possession the property was placed to accomplish the purposes of the bailor, the United States, and said corporation exercised no privilege of use, storage or consumption.

"4. The United States is the taxpayer within the meaning of the Kansas Compensating Tax Act.

"5. General Motors Corporation is not liable for any compensating tax with respect to the use of the properties within the State of Kansas.

"6. Under the Constitution of the United States, the Federal Government is immune from taxation by the State of Kansas with respect to its property, activities and instrumentalities, and it is not liable for the payment of a compensating tax with respect to its purchase, use, storage or consumption of the property in question.

"7. The State Commission of Revenue and Taxation erroneously sustained the compensating tax assessment against the General Motors Corporation, and its decision must be reversed."

As abstracted, the record before us contains over 500 pages, including numerous exhibits, but only so much thereof sufficient to show the over-all picture and to support the trial court's findings will be referred to.

In the early part of 1951 the government (Department of the Air Force) entered into certain agreements with the corporation for the manufacture of military aircraft by the corporation at the government-owned aircraft plant in Kansas City, Kansas. Two basic

agreements were made—one referred to as a "supply contract" and the other a "facilities contract." The latter contract, among other things, provided that title to all work under it completed or in the course of manufacture or assembly at the plant was to be in the government; that title to all items of facilities, materials, parts and equipment, for which the corporation would be entitled to be reimbursed, was to be vested in the government upon delivery to the corporation at any point within the continental limits of the United States, and that all such property was to remain personalty although it may be affixed to realty not belonging to the government. The facilities contract was superseded by a "definitive contract," which, among other things, provided:

"A. Title to all property furnished by the Government shall remain in the Government. Title to all property purchased by the Contractor, for the cost of which the Contractor is entitled to be reimbursed as a direct item of cost under this contract, shall pass to and vest in the Government upon delivery of such property by the vendor. Title to other property, the cost of which is reimbursable to the Contractor under this contract, shall pass to and vest in the Government upon (i) issuance for use of such property in the performance of this contract, or (ii) commencement of processing or use of such property in the performance of this contract, or (iii) reimbursement of the cost thereof by the Government, whichever first occurs."

In actual practice, the procedure followed to accomplish the purpose of the contracts in question was that the government first ascertain if the machinery and equipment requested by the corporation was needed to perform the work. It then screened its stockpiles of machinery and equipment to ascertain what equipment was available, and then authorized the corporation to purchase for and on behalf of the government those items which were requested and approved but which were unavailable through government stockpile reserves. The corporation prepared a proposed system for equipping the plant with the machinery and equipment needed to produce the aircraft, and after receiving government approval to acquire a facilities item of purchase, the corporation's purchasing department addressed a request for quotation to various suppliers, advising them that a certain piece of machinery or equipment was to be purchased for "government account." Orders were placed only after government officials concurred in the necessity for the item and the selection of a particular source of supply. The corporation's purchase order to the selected supplier made clear the government's interest in the property ordered, and on the face of the purchase order appeared the following:

"Not Subject to Kansas State Sales or Use Tax."

Purchases were moved and shipped on government bills of lading secured by the vendors from the government, and the applications for such bills of lading contained the certification of a government official that title to the property was vested in the government during transportation, and that transportation charges were properly payable from government funds. On receipt at the Kansas City plant of all property acquired by the corporation for the government, and prior to any use of the same, it was "tagged" with a property accountability number furnished by the government. These tags were permanently affixed to the property and bore both an Air Force number and the words "Property of the United States Air Force—Do not Remove This Tag."

Upon receipt and audit, the vendor's invoice bearing the stamp "COST REIMBURSABLE," was paid by a corporation check. The identical amount paid was promptly submitted to the government on its public voucher form, and the amount advanced by the corporation to the supplier was repaid. In each instance the carrier billed the proper government transportation office for the transportation charges accruing on a government bill of lading, and was paid directly by the government.

During the period in question the government at all times possessed the complete and absolute right to direct the shipment of all property acquired. If, after the corporation placed an order, it was decided by the government that the item ordered was more needed for operations unrelated to the Kansas City work the government could, and in several instances did, divert the item. Such diversion could be ordered before the item left the supplier or even when it was en route to the corporation's plant. At all times all machinery and equipment located at the plant was treated as any other government-owned property. In the event the property was damaged in transit the government offset such damage against the carrier's charge under the government bill of lading. At no time was any of the equipment or machinery in question set up on the corporation's books as an asset, and the corporation did not charge depreciation or amortization in respect to any of the machinery or equipment. The amounts advanced by the corporation as purchase prices were offset on its books as accounts receivable from the government.

The pertinent sections of the compensating (use) tax law read: G. S. 1949, 79-3702:

"For the purposes of this act ($a$) the term 'purchase price' shall mean the consideration paid or given or contracted to be paid or given by any person to the seller of an article of tangible personal property for the article purchased. The term shall include, in addition to the consideration paid or given or contracted to be paid or given, the actual cost of transportation from the place where the article was purchased to the person using the same in this state. If a cash discount is allowed and taken on the sale it shall be deducted in arriving at the purchase price.

.   .   .   .   .   .   .   .   .   .   .   .   .   .

"($c$) The word 'use' means and includes the exercise within this state by any person of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include processing, or the sale of the property in the regular course of business, and except storage as hereinafter defined.

"($d$) 'Storage' includes any keeping or retention in this state for any purpose except sale in the regular course of business or subsequent use solely outside this state of tangible personal property purchased from a retailer."

.   .   .   .   .   .   .   .   .   .   .   .   .   .

G. S. 1949, 79-3703:

"There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using, storing, or consuming within this state any article of tangible personal property purchased subsequent to June 30, 1945. Such tax shall be levied and collected in an amount equal to the purchase price paid by the taxpayer multiplied by the rate of two percent. All transactions involving compensating tax or use tax prior to July 1, 1945, shall be administered under the law as it exists prior to that date."

G. S. 1949, 79-3703a:

"For the purpose of the proper administration of this act and to prevent evasion of the tax, evidence that tangible personal property was sold by any person for delivery in this state shall be prima facie evidence that such tangible personal property was sold for use in this state."

(G. S. 1949, 79-3703, has since been amended—see G. S. 1955 Supp.)

We likewise have a sales tax law (G. S. 1949, 79-3601, *et seq.*) which also has since been amended in several respects immaterial for our purposes—see G. S. 1955 Supp.

A resume of the purpose and scope of the two tax acts is contained in *Southwestern Bell Tel. Co. v. State Commission of Revenue and Taxation,* 168 Kan. 227, 212 P. 2d 363, and *Consumers Co-operative Ass'n v. State Comm. of Rev. & Taxation,* 174 Kan. 461, 256 P. 2d 850, and we summarize briefly:

The sales tax law levies a tax of two per cent upon the privilege of selling tangible personal property at retail in this state, or rendering or furnishing certain services therein. Under that law the

event which gives rise to the tax is the *sale* of tangible personal property at retail, or the rendering or furnishing certain services. The law is framed, and has been construed, so that the transaction which is taxed is that by which a commodity moves to the ultimate consumer, whoever he may be.

With the enactment of the sales tax law another problem arose. Much property is purchased outside the state and brought into the state for various purposes. Kansas could not tax the privilege of selling property when the sale took place beyond its borders. In other words, the necessity for a "use" tax arose from the fact that a state is without power to tax sales which are completed beyond its territorial limits. The result of this situation was the enactment of the so-called "use tax" law, here involved. The two laws are, from a practical standpoint, complementary and supplemental to each other, and are to be construed together. Under the "use tax" law the taxable event giving rise to the imposition of the tax is not the sale but is the *use, storage or consumption* of property within the state which was acquired by purchase *outside* the state.

Notwithstanding that by G. S. 1949, 79-3703a, evidence that tangible personal property was sold by any person for delivery in this state shall be prima-facie evidence that such tangible personal property was sold for use in this state, the fact remains that under G. S. 1949, 79-3702 (c), the word "use" means and includes the exercise within this state by any person of any right or power over tangible personal property *incident to the ownership thereof*. In other words, insofar as we are presently concerned, the important factor to be considered is whether the corporation's *use* of the property involved was *incident to its ownership thereof,* and in our opinion the trial court's findings (No. 9, *supra*), which are amply supported by competent and substantial evidence, are conclusive on the question and binding on this court under the familiar rule of appellate review.

The situation here is unlike that in *Boeing Airplane Co. v. Commission of Revenue and Taxation,* 153 Kan. 712, 113 P. 2d 110, and in the Consumers case, *supra*. In the Boeing case the government did not own the property at the time liability for the tax arose. While it was true the government had agreed to reimburse Boeing for the cost of the property, and such property was to become government property five years hence unless one of several options to keep it was exercised by Boeing, in the meantime the property was

owned by Boeing and it was not known whether it would ever lose that ownership—therefore such a situation did not justify Boeing's exemption from the challenged tax. In the Consumers case there was no doubt but that it, the taxpayer, owned the oil drums purchased outside the state, and it was held that the use of the drums (as disclosed by the opinion) constituted a "use" of the property contemplated by the statute.

From the record it is readily apparent that the contracts involved, and the operations under them, were merely the means by which the government purchased the property and equipment for the corporation's use in manufacturing military aircraft for the government in a government-owned aircraft plant. The government owned the property upon entry into the state and continuously thereafter. In the last analysis, the use of such property by the corporation was merely to accomplish the purpose of the owner— the production of military aircraft for the government. Its use of the property was not "incident to the ownership of that property."

Various other contentions of appellant commission have been examined and considered but are found to be without merit, and, in view of our holding, require no discussion.

We find no error in this record and the judgment is therefore affirmed.