(149 P.3d 525)
No. 94,473

NEWMAN MEMORIAL HOSPITAL, d/b/a NEWMAN REGIONAL HEALTH CENTER, *Plaintiff/Appellee*, v. WALTON CONSTRUCTION COMPANY, INC., *Defendant*, EVERTON OGLESBY ASKEW ARCHITECTS, *Defendant/Appellant*, FAIRBURY GLASS CO., INC., d/b/a CONCORDIA MIRROR AND GLASS COMPANY, *Defendant*, BELLES & ASSOCIATES, INC., *Defendant*, and AMCO INSURANCE COMPANY, *Defendant*.

Opinion filed January 12, 2007.

*Wyatt A. Hoch* and *Carolyn L. Matthews*, of Foulston Siefkin LLP, of Wichita, and *James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, for appellant.

*Harold S. Youngentob*, *John A. Bausch*, and *Nathan D. Leadstrom*, of Goodell, Stratton, Edmonds & Palmer, L.L.P., of Topeka, for appellee.

Before MALONE, P.J., CAPLINGER, J., and LARSON, S.J.

LARSON, J.: This is Everton Oglesby Askew Architects' (EOAA) direct appeal from (1) the district court's ruling that Newman Me-

morial Hospital, d/b/a Newman Regional Health Center (Newman) was not subject to EOAA's statute of limitations defense because Newman was acting in a governmental and not a proprietary manner in building and leasing an office building to physicians at commercial rates; (2) rulings relating to its contract for architectural services to Newman; (3) rulings relating to the jury trial where EOAA was found liable for damages of $907,693; (4) denial of EOAA's motion for judgment as a matter of law; (5) denial of EOAA's motion alleging the jury's verdict was not supported by substantial competent evidence; and (6) jury instructions given and denied which are claimed to constitute reversible error.

## FACTUAL AND PROCEDURAL BACKGROUND
### The medical office building

Newman is a county hospital located in Emporia, Lyon County, Kansas. It is organized and exists pursuant to the provisions of K.S.A. 19-4601 *et seq.*, which allow establishment of a hospital but do not require it. There is likewise no statutory or other legal obligations to build and maintain an office building for physicians, but it is a permitted activity.

In 1994, the Newman Board of Trustees began consideration of constructing an office building next to the hospital for rental to physicians or other tenants. The minutes of the Newman Board of Trustees' meeting of June 28, 1995, contained the following statement relating to the construction of a medical office building:

"Dr. Geitz advised he has had strong feelings about this building for 1-½ years and the need to have adequate space available for physicians being recruited. Physicians being brought in who are not connected with any group have no place to go. He noted the community will have a problem over the next few years with seven primary care doctors over the age of 60; it is already difficult for people who need doctors to get in to see them. Dr. Geitz referred to Mr. Hanna's concern that this project will be harmful to local developers; however, the need has not been met by local developers. If the *Hospital* doesn't do something, *something* is going to be done. Dr. Geitz expressed his concern that an outside agency could come into the community and build the necessary facility, establishing outpatient/radiology/lab services as well, and taking business away from the community and Hospital."

A decision was made by the Newman Board of Trustees to proceed with the project of establishing a medical office building.

In June 1995, Newman contracted with EOAA to provide architectural services for the design and construction of the medical office building. EOAA had previously provided architectural services to Newman for a construction project.

### The agreement for architectural services

On June 15, 1995, EOAA and Newman entered into a written agreement titled "Standard Form of Agreement Between Owner and Architect" (hereinafter "Agreement") which was the standard contract published by the American Institute of Architects, but contained numerous and substantial modifications involving deleted language and additions showing provisions of the Agreement had been negotiated by the parties.

Numerous other parties became involved in the planning for and construction of the office building. Some were initial defendants in this case, but all except EOAA either settled or were dismissed prior to the jury trial. We will mention each one briefly but only as their obligations and actions relate to the issues on appeal between EOAA and Newman.

Newman hired Walton Construction Company, Inc. (Walton) as its construction manager for the project. Walton provided two full-time employees to supervise the work of contractors and assure the quality of their work. Walton sought and obtained bids for the project, but each contractor had its own contract with Newman, not with Walton.

Firms hired by Walton which had contracts with Newman included Belles & Associates, Inc. (Belles) for site grading, foundation, and structural steel, and Concordia Mirror and Glass Company (Concordia) to furnish and install the windows.

Under the Agreement, Newman was required to furnish the services of a geotechnical engineer to investigate, evaluate, and report on soil conditions at the building site. The Agreement (paragraph 4.9) stated EOAA was entitled to rely on the accuracy and completeness of the geotechnical engineer's report. Newman con-

tracted with Barnett, Stuart, and Associates of Topeka, a division of Terracon Consultants, to provide these services.

Although Newman selected and furnished the report of the geotechnical engineer referred to above, EOAA hired numerous other engineering consultants for the project, including structural, mechanical, plumbing, and electrical engineers. For structural engineering services, EOAA hired EMC Structural Engineers, who designated Mark Buchanan as structural engineer of record for the project.

Certain provisions of the Agreement between EOAA and Newman are particularly applicable to the issues in this case. The negotiated Agreement contained the following provision dealing with the statute of limitations:

"9.3 Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion."

With regard to the construction phase of the project, the Agreement provided, in relevant part:

"2.6.5 The Architect shall visit the site at intervals appropriate to the stage of construction or as otherwise agreed by the Owner and Architect in writing to become generally familiar with the progress and quality of the Work completed and to determine in general if the Work is being performed in a manner indicating that the Work when completed will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. On the basis of on-site observations as an architect, the Architect shall keep the Owner informed of the progress and quality of the Work, and shall endeavor to guard the Owner against defects and deficiencies in the Work. . . .

"2.6.6 The Architect shall not have control over or charge of and shall not be responsible for construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's responsibility under the Contract for Construction. The Architect shall not be responsible for the Contractor's schedules or failure to carry out the Work in accordance with the Contract Documents. The Architect shall not have control over or charge of acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons performing portions of the Work. However, if the Architect becomes aware of

failures of the Contractor to carry out the Work in accordance with the Contract Documents, the Architect shall immediately notify the Owner of such failures."

The last sentence of paragraph 2.6.6 was a typed-in addition to the standard AIA contract language.

### The geotechnical report, building design, and construction

Barnett's report documented EMC's findings based on subsurface exploration and made recommendations for foundation construction noting the medical office building was planned to have a "slab-on-grade" at the first floor level. A slab-on-grade is a concrete floor placed directly on the soil with a structural slab being one that supports itself without coming into contact with the soil. Comparatively speaking, a slab-on-grade floor is very economical in that it can cost only one-fifth of the cost of a structural slab floor.

The Barnett report made detailed recommendations regarding both foundation support and the preparation of the site for that type of foundation. As to the risk of floor movement, the report stated:

"The procedures recommended above for moisture control during and after construction of the floor slab subgrade and use of low plasticity and low volume change material should reduce the potential for subgrade volume change and floor slab movement resulting from variations in moisture content. However, since highly plastic soils on the site extend to a considerable depth, some long term volume change of the subgrade could occur and should be considered. If it is desired to further reduce the potential for subgrade volume change, the use of a greater thickness of low plasticity soil beneath the floor slab would be necessary. To eliminate the risk of floor movement, a structural slab should be considered."

The medical office building was constructed using a slab-on-grade on the first floor, as was an adjacent building for which EOAA had been the architect.

Construction was completed on the medical office building to the point where it could be occupied by tenants in late February or early March 1997; this point and time in the construction process is known as "substantial completion." The certificate of substantial completion referred to in paragraph 9.3 of the Agreement was issued on February 18, 1997.

The record reflects that by July 17, 1997, Newman had knowledge of water leaking through or around the windows in the med-

ical office building and that the leaking caused damage to interior finishes. Concordia was the window contractor. It is also uncontroverted that by May 5, 1998, Newman was aware that the first floor concrete slab was heaving, causing damage to brick veneer, floor tile, doors, and drywall. Belles was the contractor that installed the slab. Belles and Concordia were obligated contractually to correct defects upon notice, which was given, and warranty work was apparently done during late 1997 and 1998.

### Filing of this lawsuit and pretrial proceedings

Although negotiations between the parties apparently existed, the record reflects that on July 31, 2002, Newman filed a petition against EOAA, Walton, Fairbury Glass Co., Inc., d/b/a Concordia Mirror and Glass Company, Belles, and AMCO Insurance Company alleging breach of contract, breach of express and implied warranties, negligence, and strict liability. Newman subsequently added as defendants David J. Sprague, d/b/a Concordia Mirror and Glass Company, Concordia Mirror and Glass Company, Inc., Belles, Inc., and Fidelity and Deposit Company of Maryland (Fidelity). In their answers, the defendants, including EOAA, denied liability and alleged affirmatively as a defense that Newman's causes of action were barred by the applicable statute of limitations.

After a period of discovery, EOAA and the other defendants filed a joint motion for summary judgment, contending Newman's construction and leasing of the medical office building were proprietary functions and, therefore, Newman's claims were subject to the applicable statute of limitations and time barred because they were filed after the expiration of the longest applicable limitations period of 5 years as provided in K.S.A. 60-511(1).

Newman responded and admitted it was aware of the window and slab problems respectively by July 1997 and May 1998, but considered these facts immaterial or irrelevant because defendants continued to negotiate with Newman concerning remedial repairs throughout 2000 and 2001. Newman did not controvert the defendants' statement that EOAA design services did not include an express warranty on EOAA's professional services.

Additionally, Newman filed a cross-motion for summary judgment, claiming immunity from the statute of limitations based on the contention that its construction of the medical office building was a governmental, not proprietary, function. Alternatively, Newman argued if it was not immune from the statute of limitations, its claims of breach of contract and breach of express warranty did not accrue until sometime after July 31, 1997, and, thus, those claims were not time barred. Finally, Newman urged the district court to find the defendants were estopped from asserting a statute of limitations defense due to their deliberate engagement in continued negotiations regarding remedial repairs.

After a hearing on the summary judgment motions and some additional briefing where Newman asserted its cause of action against EOAA accrued August 13, 1999, the date EOAA advised Newman it had contacted the window manufacturer regarding remedying the window problems, the district court denied the defendants' joint summary judgment motion. In doing so, the district court order stated:

"It is the Court's ruling that there is an issue of material fact whether the movants are estopped from asserting defenses of expiration of the limitation statute. As to Concordia Mirror and Glass and Belles & Associates, Inc., there are material issues of fact as to whether the statute of limitations expired on or before 31 July 2002.

"If there are material issues of fact whether the statute of limitations expired as to Concordia Mirror and Glass and Belles & Associates, there are material issues of fact whether the statute of limitations expired as to the architect and general contractor."

The district court, however, granted Newman's cross-motion for summary judgment, holding Newman was not subject to the statute of limitations defense because its construction and leasing of the medical office building was a governmental and not a proprietary function. In doing so, the court relied on the language contained in a property tax exemption statute, K.S.A. 2002 Supp. 79-201a *Second*. The court stated that if narrowly construed, the statute would apply only to *ad valorem* taxation but if broadly construed, it would conclusively determine the construction and operation of

the medical office building was a governmental function, which the district court so found.

As the result of settlements, Newman claims against Walton, Fairbury, Sprague, Concordia, AMCO, and Belles were dismissed with prejudice. Fidelity was later granted summary judgment. This left EOAA as the sole remaining defendant at the time the case went to a jury trial.

### Jury trial proceedings

Newman's claims against EOAA were based at trial on breach of contract and breach of implied warranty of performance in a workmanlike manner of the contract for architectural services in the following ways:

"1. Defective design which did not properly take into consideration expansive soil on site;

"2. Providing inadequate design details;

"3. Failure to follow up on soil report and to properly take the expansive nature of the soil under the site into consideration in the design of the building;

"4. Improperly allowing the concrete slab to be placed directly upon soil despite knowledge of soil movement;

"5. Improperly inspected work of contractors;

"6. Improperly allowed installation of grade beams without requiring they be tied to piers;

"7. Improperly gave certification for payment of work of contractors when such work was defective and deficient; and

"8. Improperly accepted building despite defects in design and work."

Newman primarily contended the design of the building was defective, EOAA failed to take into account the expansive soil at the building site and improperly called for slab-on-grade under those conditions, and improperly inspected the work of contractors, especially that dealing with the installation of windows.

EOAA denied that it breached the design contract; alleged it was contractually entitled to and did rely on Barnett's geotechnical report which included recommendations for a slab-on-grade construction; and with respect to the inspection allegation, contended it notified Newman and Walton when it became aware of the leaking windows and is not responsible under the design contract for the contractors' failure to follow the contract documents.

*Trial testimony*

The jury trial covered a 9-day period with numerous expert witnesses testifying and a large number of exhibits presented, including the contract for architectural services between Newman and EOAA.

It is not necessary for the result we reach to detail the testimony of each witness, but we will highly summarize Newman's main contentions and the evidence presented relative thereto and EOAA's numerous defenses and the applicable evidence supporting them.

Central to Newman's claims that EOAA's building design was faulty was the usage of slab-on-grade flooring which had heaved up 2 inches, causing substantial damage to the building. Evidence showed the architect knew that soil movement can be counteracted by use of caissons, a raised structural slab which supports itself or the removal of elastic soil under a building and its replacement with engineered-approved fill soil.

Newman's expert, Stan Pedersen, a Kansas licensed architect, testified the design team failed to fully consider Barnett's report which suggested use of structural slab to eliminate movement and further did not adequately inquire as to the magnitude of expected soil movement.

Mark Peterman, a licensed structural engineer, testified for Newman and opined the design team failed to design for ground movement, failed to even consider a structural slab and that it was a departure from standard engineering practice to design the floor without so inquiring.

Newman argues on appeal that the testimony of EOAA's structural engineer, William Francis O'Donnell, did not reflect much disagreement with their expert. O'Donnell testified his design was based on not over ½ inch of soil movement but faulted the Barnett report for not providing proper recommendations.

Newman also presented a soil engineer, Ron Reed, who concluded the damage to the first floor was caused by expansive clay under the slab. He testified the Barnett report was sufficient without specifying the amount of soil movement expected. Reed opined

that a much larger replacement of the clay soil should have been utilized, up to 12 to 14 feet.

EOAA countered by showing EOAA and Barnett had both worked on an adjacent building in which a slab-on-grade floor had been used successfully with a replacement of 24 inches of low plasticity. On the medical office building, the Barnett report had recommended only replacement of a minimum of 18 inches of low plasticity soil although up to 4 feet of soil had ultimately been replaced.

EOAA further showed that although Peterman testified the slab-on-grade should be replaced with a structural slab in a letter to Newman, he had indicated that such a replacement was "not economically feasible." Peterman acknowledged another building which was adjacent to the medical office building had been built with a slab-on-grade first floor and did not experience significant slab movement. In addition, Newman's architectural expert Pedersen testified he has not recommended the use of a structural slab for a building in the past 10 years.

EOAA said the Barnett report had suggested the structural slab to eliminate the risk of soil movement but did not affirmatively recommend implementation of a structural slab on the project. Central to EOAA's defense was the fact its agreement with Newman stated it should "rely upon both the accuracy and completeness of [geotechnical report]."

As to damages, EOAA contended Newman's evidence was premised on tearing out the entire first floor and replacing it with a structural slab floor, which EOAA claimed was not intended or practical. Half of the first floor had been completed slab-on-grade without any problem and the testimony of Newman's expert, Philip Schultze, of a general contracting firm, was "preliminary," could be off plus or minus 20 to 30 percent and did not properly calculate the floor to be replaced.

Newman countered the EOAA's damage arguments by pointing to the testimony of Schultze being admitted showing his estimate of the cost of making the building "right," the testimony of Peterson as to the cost of the structural slab, and the testimony of Harold

Blits, Newman's director of facility management, concerning the costs of repairs taken and those needed.

It is sufficient to say there was conflicting testimony as to the building design and the damages or absence thereof. The legal effect of the contractual language was a question for the court and not the jury.

There was also conflicting evidence as to the responsibility for and the inspection of the installation of the windows. Newman presented testimony showing the windows were not installed as required by the manufacturer's instructions and that EOAA's on-site architect, Sam Anderson, should have viewed an installation in detail, which he failed to do. Newman's testimony was that EOAA should have performed 28 visits over "80-some-odd man days" but only 13 observation reports of the required 28 contractual visits could be found.

EOAA's testimony showed that adequate and sufficient inspections were made, Newman received reports as soon as defects were known, primarily the alleged defects in the windows were the result of Newman's contract with the window installer, and the specific provision of the agreement between Newman and EOAA stated that EOAA "shall not be responsible for the contractor's . . . failure to carry out the work in accordance with the contract documents."

There were numerous trial rulings and instructions which were objected to by EOAA which we need not now detail but which were reserved and raised.

At the conclusion of the trial, the jury found EOAA breached both its contract with Newman and the implied warranty of workmanlike performance. The jury awarded damages of $1,059,289 for the cost of repairs to the medical office building and $133,404 for loss of rental income. The verdict was accepted, but the district court found EOAA was entitled to a credit of $285,000 against the jury's award of damages for amounts received by Newman in settlements with other parties. The judgment entered was for $907,693 plus costs.

### Posttrial proceedings

Although EOAA had unsuccessfully moved for judgment as a matter of law after Newman concluded its presentation of evidence

contending as a matter of law it was not contractually responsible for the contractors' faulty work on windows and masonry and, further, it was contractually entitled to rely on the accuracy and completeness of the geotechnical engineer's report regarding the slab, EOAA again moved posttrial for judgment for the same reasons.

In the alternative, EOAA moved for a new trial challenging the court's admission of damages relating to the costs of a structural slab, asserting violations of an order in limine, challenging the failure to give a betterment instruction, and challenging the changing of an instruction regarding the contract after defense counsel completed his closing argument.

The district court denied EOAA's motion for judgment as a matter of law, finding the jury was properly instructed and there was substantial evidence to support the jury's verdict. The court refused to grant a new trial, finding because the damage award was less than what was requested by Newman, the court would not speculate as to the type of floor the jury considered in determining the amount of damages for the first floor repairs.

EOAA has timely appealed, raising numerous issues.

## THE APPEAL
### Issues raised on appeal

EOAA raises the following issues on appeal:

"1. [Newman] filed this action after the statute of limitations expired.
   A. Did the trial court err in holding that constructing and owning a medical office building for lease to commercial tenants was a governmental function in which plaintiff was immune from a statute of limitations defense?
   B. Did the trial court err in holding that EOAA was estopped to assert a limitations defense when the purported ground for the estoppel was conduct of other defendants (*e.g.*, investigation of a bond claim by a subcontractor's surety)?

"2. [Newman] claimed EOAA was liable for . . . (leaking windows damage) resulting from breach of contract by the construction manager/general contractor and its supplier/installation subcontractor in installing windows and masonry.
   A. Did the trial court err in denying architect EOAA judgment as a matter of law because its contract with plaintiff expressly provided (1) that EOAA was not liable for the contractors' failure to carry out the work in accordance with their contracts and (2) that EOAA only agreed to inspect for purposes of being 'generally informed' of progress and to report defects actually known?

    B.   Did plaintiff fail to prove the essential element of damages because it had no evidence of any separate damages attributable to the architect's alleged failure to adequately inspect?

"3.   The geotechnical engineer's report gave specific directions it deemed adequate for installing a slab-on-grade first floor. [Newman] claimed [EOAA] . . . should have discovered that the report was inaccurate and incomplete and, upon requesting additional information, should have recommended construction of a much more costly structural slab floor.

    A.   Did the trial court err in denying EOAA judgment as a matter of law because EOAA's contract with plaintiff expressly provided that EOAA could rely on both the 'accuracy and completeness' the geotechnical engineer's report?

    B.   Did plaintiff fail to prove an essential element of a breach of contract claim because it did not prove any compensable damages, claiming instead damages for an upgrade or betterment not contracted for which no witness recommended and was admitted to be 'not economically feasible' by plaintiff's own expert?

"4.   In addition or in the alternative, should the court reverse judgment because the verdict was not supported by substantial evidence?

"5.   In addition to or in the alternative, . . . should the court reverse and remand for a new trial based on numerous trial court errors in rulings of law, jury instructions, and admissions of evidence?"

Newman, as would be expected, argues that it is immune from the statute of limitations for its cause of action arising out of the construction of the medical office building; K.S.A. 60-521 is inapplicable as its construction and operation of the medical office building is a governmental function under the KPERS test; the legislature has not waived immunity from the statute of limitations for actions related to real estate; substantial evidence at trial supports the jury verdict finding the architect breached its contract; damages awarded by the jury were supported by substantial competent evidence; and there were no trial errors requiring reversal and, if there were errors, they were harmless.

### Standards of review

As the standards of review differ as to each issue raised, they will be set forth as we consider the issues in our opinion.

### ARGUMENTS, ANALYSIS, AND DECISION
#### Summary of arguments

EOAA first argues the trial court erred in entering summary

judgment in favor of Newman and against EOAA on its contention that the 5-year statute of limitations applicable to contract claims (K.S.A. 60-511[1]) barred Newman's contract cause of action. EOAA further contends Newman's claim for breach of the implied warranty of workmanlike performance is subject to a 3-year statute of limitations as provided by K.S.A. 60-512(1), relying on *Zenda Grain & Supply Co. v. Farmland Industries, Inc.*, 20 Kan. App. 2d 728, 742, 894 P.2d 881 (1995).

The specific district court ruling EOAA claims to be erroneous is that Newman's construction and leasing of the medical office buildings constituted a governmental function, leaving Newman immune from the applicable statute of limitations, K.S.A. 60-521. EOAA specifically takes issue with the district court's exclusive reliance on language found in a tax exemption statute, K.S.A. 2005 Supp. 79-201a *Second.*

EOAA relies on the uncontroverted facts that substantial completion of performance under the architectural services contract occurred no later than March 1997 and the alleged breaches of contract by EOAA (failure to properly inspect window installation and failure to design a structural slab floor) all occurred prior to the date of substantial completion of the medical office building.

Finally, EOAA disputes Newman's estoppel argument, claiming it did nothing to induce delay and/or inaction by Newman and that it is not chargeable with the acts or actions of other parties Newman contracted directly with. Therefore, EOAA maintains Newman's claims were and are time barred.

Newman strongly argues K.S.A. 60-521 is not applicable because its construction and operation of the medical office building is a governmental function, leaving Newman not subject to any limitations period. Newman argues health care is an essential governmental function, relying on K.S.A. 2005 Supp. 76-3302(a)(1) and the provisions of K.S.A. 79-201a *Second* which specifically state that the lease of real property to provide office space necessary for the performance of medical services "shall be construed to be a governmental function."

EOAA recites the K.S.A. 60-256 language as to the granting of summary judgment being proper where there is no genuine issue

as to any material fact found in *Bracken v. Dixon Industries, Inc.*, 272 Kan. 1272, 1274-75, 38 P.3d 679 (2002). Newman suggests there is no dispute as to the material facts by either party, making our court's review de novo, citing *Ekan Properties v. Wilhm*, 262 Kan. 495, 501, 939 P.2d 918 (1997). While these issues may have been initially raised by summary judgment motions, they are in reality issues of law and statutory construction over which we have unlimited review. See *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 716, 924 P.2d 1239 (1996).

### *Governmental or proprietary function*

K.S.A. 60-521 provides (subject to two exceptions not applicable here) that

"[a]s to any cause of action accruing to the state, any political subdivision, or any other public body, which cause of action arises out of any proprietary function or activity, the limitations prescribed in this article shall apply to actions brought in the name or for the benefit of such public body in the same manner as to actions by private parties . . . ."

Thus, by negative implication, K.S.A. 60-521 "retains governmental immunity from the statute of limitations for causes of action arising out of a governmental function. [Citations omitted.]" *State ex rel. Stovall v. Meneley*, 271 Kan. 355, 384, 22 P.3d 124 (2001). The rationale behind K.S.A. 60-521 is rooted in the public policy that "*public* rights and causes of action should not be lost by the acts or admissions of public officers. [Citations omitted.] *Public* rights, however are not at issue when a municipality's cause of action arises out of a proprietary function." *City of Wichita, Kan. v. U.S. Gypsum Co.*, 828 F. Supp. 851, 861-62 (D. Kan. 1993) (quoting in *KPERS v. Reimer & Koger Associates, Inc.*, 262 Kan. 635, 660, 941 P.2d 1321 [1997]).

This brings us to the controlling question. Was Newman's construction and leasing of the medical office building a governmental or a proprietary function or activity?

It is instructive to first examine the uncontroverted facts concerning Newman and the planning for, construction of, and leasing and operation of the medical office building which are central to this case.

Newman is a county hospital authorized but not required to be operated pursuant to K.S.A. 19-4601 *et seq.* Newman had the right but not the legal obligation to build and lease office space for physicians.

The minutes of the Newman Board of Trustees recognized the medical office building would aid in recruiting new physicians to Emporia but would compete with private individuals, groups, or other entities who might compete with the hospital.

The medical office building was financed by the sale of taxable revenue bonds. No tax revenues have been used to pay interest, principal, or other expenses of the medical office building.

The medical office building generated gross profit (operating revenue less operating expenses) for Newman in years 1999, 2000, and 2002. Medical office building tenants are not required to be members of the Newman medical staff and pay rent to Newman at the market rent of $12.50 per square foot per year in accordance with written lease agreements. Federal law requires the leases to be set at fair market value to avoid criminal prosecution under the federal anti-kickback statute. See 42 U.S.C. § 1320a-7b (2000); 42 U.S.C. § 1395nn (2000); and 42 U.S.C. § 1320a-7(a)(1) (2000).

The purpose of the medical office building is to provide needed health care to Emporia, Lyon County, and the surrounding community. The use of the medical office building for rental to physicians fulfills a recognized public benefit. Newman's services are open to all persons in Kansas without regard to their locality and Newman renders emergency services without regard to the ability of the person needing such services to pay.

In explaining the difference between what is a governmental versus what is a proprietary function, our Supreme Court succinctly said in *State ex rel. Stovall v. Meneley*, 271 Kan. at 384:

"Governmental functions are those performed for the general public with respect to the common welfare for which no compensation or particular benefit is received. Proprietary functions, on the other hand, are exercised when an enterprise is commercial in character or is usually carried on by private individuals or is for the profit, benefit, or advantage of the governmental unit conducting the activity. *McAfee*, 2 Kan. App. 2d at 276. See also *International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, Syl. ¶ 3, 798 P.2d 960 *rev. denied*, 248

Kan. 996 (1991) (governmental powers are exercised to 'administer the affairs of the state and promote the public welfare generally')."

*International Ass'n of Firefighters v. City of Lawrence*, 14 Kan. App. 2d 788, 798 P.2d 960 (1990), cited above, set forth the same basic difference between governmental and proprietary functions when it opined:

"Governmental or legislative powers are exercised to administer the affairs of the state and promote the public welfare generally. [Citation omitted.] Proprietary or administrative powers are exercised to accomplish private corporate purposes in which the public is only indirectly concerned and as to which the municipality is regarded as a legal individual. [Citation omitted.]" 14 Kan. App. 2d at 794.

Newman strongly points us to the statement from *KPERS v. Reimer & Koger Associates, Inc.*, that "[a] statute of limitations does not run against the state unless expressly so provided, and all doubts as to whether it shall run are to be resolved in favor of the state." 262 Kan. 635, Syl. ¶ 4. However, it must be pointed out the facts in *KPERS* are completely different from our case with clear state action there involved while we consider the construction and leasing of a medical office building for what is basically commercial purposes. In addition, the *KPERS* opinion quoted in detail and at length from *City of Wichita, Kansas v. United States Gypsum Co.*, 828 F. Supp. at 861-62, where it was said that a favorable resolution of "all doubts" was not required. The full discussion is set forth in *KPERS*, 262 Kan. at 660, but concludes: " 'The court concludes that no rule of law favors either defendants or plaintiff in determining whether plaintiff's cause of action arises out of a proprietary or governmental function.' "

We have fully considered, but will not needlessly repeat in this opinion, all of the cases cited and the accompanying discussions on the governmental versus proprietary question found in *KPERS*, 262 Kan. at 648-65.

There are, however, two Kansas cases which have a direct application to our case, as they involve whether actions of hospitals located in Kansas are governmental or proprietary in nature. While both involve immunity rather than limitations questions, they are

on point as to the proprietary versus governmental function we face.

The Kansas Supreme Court has twice held that when a governmental entity operates a hospital, it acts in a proprietary function. In *Stolp v. City of Arkansas City*, 180 Kan. 197, 303 P.2d 123 (1956), the court held that the operation of a hospital by a city was a proprietary function rather than a governmental function and, therefore, not immune from tort liability. In *Carroll v. Kittle*, 203 Kan. 841, 849-50, 457 P.2d 21 (1969), the Kansas Supreme Court extended *Stolp* by holding that the Kansas Board of Regents' operation of the University of Kansas Medical Center is a proprietary function. The court stated: "[W]e see no reason why the rule applied to city hospitals in the *Stolp* case should not now be given general application." 203 Kan. at 850.

In the *Stolp* case, the proprietary finding appears to have been based in part on the contractual relationship between the hospital and a patient, as the court said:

"[T]he type of municipal hospital provided here is one which possesses the elements of a proprietary rather than a governmental function in that primarily any contract between a patient and the city is one of a private and personal nature for pay and the proceeds are placed in a hospital fund which provides a direct profit, benefit, or advantage to the city and its inhabitants as against a benefit to the public in general." 180 Kan. at 203-04.

In *Carroll*, which is better known for the Kansas Supreme Court's abolishment of the judicially created doctrine of governmental immunity, the opinion was firm in its holding that operating the hospital was a proprietary function and opined:

"We have no hesitancy in concluding that in the operation of the hospital at the University Medical Center the Board of Regents was engaged in a proprietary rather than a governmental function. The operation of a hospital is usually carried on by private individuals or private companies; private patients in the University hospital paid rates comparable to those which were charged in private hospitals; the hospital was receiving an annual income of approximately $6,000,000.00 a year from private patients, and obtained 97 doctors for the medical school's faculty at a nominal salary of $3,600.00 a year because of the hospital facilities furnished them for their private patients." 203 Kan. at 850.

Newman argues that it provides services to all residents of Kansas. It must then also be in competition with hospitals operated by

private individuals or corporations which are located in our state. The Newman trustees were concerned about competitive actions of private groups. All of these factors weigh heavily for a finding that Newman is acting in a proprietary manner in the construction and leasing of the medical office building at issue in our case.

We take guidance as our Supreme Court did in *KPERS v. Reimer* from immunity cases where the governmental versus proprietary question was at issue and, while *Carroll* and *Stolp* are not controlling, they demonstrate that a hospital owned by a governmental entity can and often does engage in proprietary functions.

Factors which have been utilized by Kansas courts in determining whether a governmental entity is carrying on a proprietary or governmental function include (1) whether the activity is for the state as a whole or special local benefit (in our case, the economic benefit of the medical office building flows to Newman and Lyon County); (2) whether the activity arises out of a statutory duty or a privilege granted (in our case, it was a permitted and not a mandated duty); (3) whether the activity is normally done by private entities (in our case, Newman charges market rates and normally makes a gross profit—indicia of a proprietary business); and (4) whether the entity's actions were commercial in nature (in our case, the leasing of a building is a commercial act). These factors all point to requiring a holding that the functions of Newman in this case were proprietary in nature.

### Statutory provisions

Newman raises three statutory provisions in its defense of the district court's holding that Newman's construction of the medical office building was a governmental function. The provisions of K.S.A. 2005 Supp. 76-3302(a)(1) and K.S.A. 2005 Supp. 79-201a *Second* were raised below and will be considered. K.S.A. 60-509 is raised for the first time on appeal and will not be considered. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003).

In asserting the preservation of public health and providing health care are essential governmental functions, Newman relies on the language of K.S.A. 2005 Supp. 76-3302(a)(1) that states:

"Provision of health care is an essential governmental function protecting and promoting the health and welfare of the citizens of the state of Kansas." This statement is made, however, in the narrow context of a 1998 act establishing and creating the "University of Kansas Hospital Authority." See K.S.A. 2005 Supp. 76-3301 *et seq.*

The language relied on by Newman is further explained as relating to education and research at a teaching hospital and such functions are specifically stated to be deemed "matters of public necessity for the entire state." K.S.A. 2005 Supp. 76-3302(b).

This policy statement is limited to the creation of a specific instrumentality of the State of Kansas in the establishment of a specific hospital authority and is not controlling in the determination of whether Newman's construction and leasing of the medical office building is a proprietary or governmental act. What we must look to and evaluate are all of the facts and circumstances regarding the reasons for and the effects of Newman's decision to establish the medical office building.

The other statutory provision in issue, K.S.A. 2005 Supp. 79-201a *Second*, is a tax exemption provision amended by the legislature in 1994 to give tax exempt status to medical office buildings. The district court relied on its language solely in upholding Newman's summary judgment motion.

K.S.A. 2005 Supp. 79-201a contains 20 subsections designating property that is exempt from property and ad valorem taxes. The first sentence of K.S.A. 2005 Supp. 79-201a identifies the scope of the provision: "The following described property, to the extent herein specified, shall be exempt from all property or ad valorem taxes levied under the laws of the state of Kansas." K.S.A. 2005 Supp. 79-201a *Second* then provides:

"All property used exclusively by the state or any municipality or political subdivision of the state. All property owned, being acquired pursuant to a lease-purchase agreement or operated by the state or any municipality or political subdivision of the state, including property which is vacant or lying dormant, *which is used or is to be used for any governmental or proprietary function* and for which bonds may be issued or taxes levied to finance the same, shall be considered to be used exclusively by the state, municipality or political subdivision for the purposes of this section. The lease by a municipality or political subdivision of the state of any real property owned or being acquired pursuant to a lease-purchase

agreement for the purpose of providing office space necessary for the performance of medical services by a person licensed to practice medicine and surgery or osteopathic medicine by the board of healing arts . . . *shall be construed to be a governmental function,* and such property actually and regularly used for such purpose shall be deemed to be used exclusively for the purposes of this paragraph." (Emphasis added.)

Interestingly, the L. 1997, ch. 126, sec. 36, added dentistry, optometry, and podiatry services and L. 1998, ch. 146, sec. 1, added psychology services to the professions whose leasing of office space from a municipality or political subdivision of the state is exempt from property or ad valorem taxes.

The district court, in its opinion, opined there was no evidence the legislature intended to overrule *Stolp* and *Carroll* but that the intent was a response to several Board of Tax Appeals and court rulings, *Salina Airport Authority v. Board of Tax Appeals,* 13 Kan. App. 2d 80, 761 P.2d 1261 (1988), and *Tri-County Public Airport Auth. v. Board of Morris County Comm'rs,* 245 Kan. 301, 777 P.2d 843 (1989), that government property used for proprietary uses would be subject to ad valorem taxes. This is our long-time rule. There is no evidence these amendments were in any way intended to apply to any of the provisions of the Code of Civil Procedure and simply provided a tax benefit to certain health care professionals.

In utilizing only the statement that for tax exemption purposes, a proprietary usage would be construed, the district court failed to acknowledge language that the property at issue might "be used for any governmental or proprietary function" as was stated in the preceding sentence. We question whether the language utilized by the district court should be given the broad and binding effect that it was given in the courts below.

The arguments of the parties to us on appeal are predictable. EOAA challenges the district court's sole reliance on K.S.A. 2005 Supp. 79-201a *Second* and contends it relates only to a tax exemption and has nothing to do with a statute of limitations question under K.S.A. 60-521.

Newman maintains the district court's reliance on K.S.A. 2005 Supp. 79-201a *Second* was proper and that such provision can be regarded as *in pari materia* with K.S.A. 60-521.

In discussing when statutes are deemed to be *in pari materia,* 2B Singer, Statutes and Statutory Construction § 51:03, p. 202 (6th ed. 2002) (hereinafter "Singer") teaches us:

"Statutes are considered to be in pari materia when they relate to the same person or thing, to the same class of persons or things, or have the same purpose or object . . . [c]haracterization of the object or purpose is more important than characterization of subject matter in determining whether different statutes are closely enough related to justify interpreting one in light of the other."

The Kansas case relied on by Singer in discussing whether statutes "have the same purpose or object" is *State v. Bradley,* 215 Kan. 642, 527 P.2d 988 (1974), which states in syllabus ¶ 5:

"Where two statutes are enacted in the same session of the legislature, have the same effective date and relate to public employees performing dangerous and vital duties, having a common purpose to protect that class of persons, they are *in pari materia* and must be read together when interpreting them."

*State v. Bradley* was also discussed in *In re Adoption of Baby Girl H,* 12 Kan. App. 2d 223, 227-28, 739 P.2d 1 (1987), which recited similar language to that previously set forth in *Singer* that is attributed to *Clark v. Murray,* 141 Kan. 533, 537, 41 P.2d 1042 (1935):

"Statutes *in pari materia* are those which relate to the same person or thing, or to the same class of persons or things, or which have a common purpose, and although an act may incidentally refer to the same subject as another act, it is not *in pari materia* if its scope and aim are distinct and unconnected. It is a well-established rule that in the construction of a particular statute, or in the interpretation of its provisions, all statutes relating to the same subject, or having the same general purpose, should be read in connection with it, as together constituting one law, although they were enacted at different times, and contain no reference to one another." 12 Kan. App. 2d at 227.

In resolving these principles and deciding whether statutes should be read *in pari materia, Singer* further suggests:

"Although broad categories are obviously not helpful for determining what statutes should be construed in pari materia, the principle that related statutes, or statutes on the same subject or having the same purpose should be construed together does not show on its face how broadly or narrowly the classification should be defined. The guiding principle, however, is that if it is natural and reasonable to think that the understanding of members of the legislature or persons to be affected by a statute, be influenced by another statute, then a court

called upon to construe the act in question should also allow its understanding to be similarly influenced. Because this is a pragmatic kind of test, the best way to understand and predict what statutes the courts would consider closely enough related is by examining and comparing examples of the kinds of statutes that have been held to be in pari materia and those which were held not to be." 2B Singer, § 51.03, pp. 212-13.

The following Kansas cases are then listed as those where statutes have been considered to be *in pari materia*:

"**Kansas**. *General Motors Corp. v. State Commission of Revenue and Taxation*, 182 Kan. 237, 320 P.2d 807 (1958); *Fincher v. Fincher*, 182 Kan. 724, 324 P.2d 159 (1958); *In re Smith's Estate*, 183 Kan. 158, 325 P.2d 63 (1958); *Custom Built Homes Co. v. Kansas State Commission of Revenue and Taxation*, 184 Kan. 31, 334 P.2d 808 (1959).

"Recidivism statute and statute concerning length of sentence for crime. *Robertson v. State*, 206 Kan. 320, 478 P.2d 196 (1970).

"Survival statute and wrongful death statute. *Flowers v. Marshall*, 208 Kan. 900, 494 P.2d 1184 (1972).

"Conveyancing and recordation statutes. *Luthi v. Evans*, 223 Kan. 622, 576 P.2d 1064 (1978).

"Retail Sales Tax Act and Compensating Tax Act (statute that equalizes tax liability for out-of-state sales) should be construed together. *Appeal of K-Mart Corp.*, 238 Kan. 393, 710 P.2d 1304 (1985).

"General mechanics lien statutes and statutes dealing specifically with oil and gas properties should be construed harmoniously. *Interlake, Inc. v. Kansas Power & Light Co.*, 7 Kan. App. 2d 16, 637 P.2d 464, 33 U.C.C. Rep. Serv. 171 (1981), *judgment rev'd on other grounds* 231 Kan. 251, 644 P.2d 385 (1982)." 2B Singer, § 51.03, p. 221.

The *General Motors Corporation v. State Commission of Rev. & Taxation*, 182 Kan. 237, 320 P.2d 807 (1958), case involved the sales tax and the use tax; the *Fincher v. Fincher*, 182 Kan. 724, 324 P.2d 159 (1958), case found statutes relating to divorce and residence, both in chapter 60 should be construed together; although listed above as *In re Smith's Estate*, the correct case name actually is *Smith v. Kansas Turnpike Authority*, 183 Kan. 158, 325 P.2d 63 (1958), and it held two statutes enacted together dealing with the taking of private property for public use were *in pari materia*; and *Custom Built Homes Co. v. Kansas State Commission of Rev. and Taxation*, 184 Kan. 31, 334 P.2d 808 (1959), cited the *General Motors* case and construed together taxation statutes.

We need not discuss each case factually further or in more detail, as they all show the closeness that must exist where statutes are construed to be *in pari materia*. It is clear to us that the scope and aim of a taxation exemption statute (K.S.A. 2005 Supp. 79-201a *Second*) is distinct and unconnected from a Code of Civil Procedure statute (K.S.A. 60-521), and the clear connectivity which is shown by the cases cited above do not exist under the facts we face in our case. Based on this analysis, the two statutes in issue in our case are not *in pari materia*. We are not required to override all of the overwhelming facts showing the construction and leasing of the medical office building to be a proprietary function by the single statutory provision relied on by the district court.

We need not restate all the facts and circumstances surrounding Newman's construction and leasing of the medical office building which demonstrate Newman's actions were proprietary and not governmental. When these facts and circumstances are unchanged by any applicable statutory enactment, we hold that pursuant to K.S.A. 60-521 the 5-year statute of limitations period of K.S.A. 60-511(1) applied to Newman's contract cause of action against EOAA and the district court erred in holding otherwise.

As we have previously stated, the contract for architectural services between Newman and EOAA was the subject of apparent negotiations, with language added and provisions struck, but contained a specific agreement as to the date from which any applicable statute of limitations would run as was set forth in paragraph 9.3 of the agreement which states:

"Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion, or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion."

Based on the specific time established for a cause of action to accrue, it is uncontroverted that the date of substantial completion of construction of the medical office building took place on February 17, 1997, and under the facts, no later than the end of March 1997. Neither party has discussed the time the certificate of pay-

ment was issued which is not a question we must consider. It is clear that the alleged breach of contract by EOAA, failure to witness and properly inspect window installation, and failure to design a suitable slab floor, occurred on or before the date of substantial completion which we establish as being uncontroverted to have occurred prior to March 31, 1997.

The present action was filed by Newman on July 31, 2002. This is clearly 4 months beyond the latest time in which Newman had to bring a claim for breach of contract against EOAA, and the district court erred in failing to find Newman's breach of contract claim under the agreement for architectural services was barred by the provisions of the applicable statute of limitations, K.S.A. 60-511(1).

The district court found in ruling on the joint motion for summary judgment of EOAA and other defendants that it was not disputed that (1) construction was substantially completed on the medical office building in late February or early March 1997; (2) Newman was aware of the window leaks and resulting damage by July 17, 1997; and (3) Newman was aware by May 5, 1998, that the concrete floor was heaving and causing other damage. With Newman's claim for breach of implied warranty of workmanlike performance being subject to a 3-year statute of limitations provided in K.S.A. 60-512(1), it is clear that this limitation period had also expired by the time Newman filed its petition against EOAA on July 31, 2002.

Unfortunately, the district court faced an extremely difficult task in considering a joint summary judgment with defendants subject to different contractual terms and different actions in response to the problems the construction of the medical office building presented. In denying the joint defendant motion for summary judgment, the district court erroneously found there were issues of material fact regarding whether the statute of limitations had expired as to Newman's claims against EOAA. The court specifically based this finding on a determination there were material issues of fact with respect to whether the statute of limitations had expired as to Newman's claim against Concordia and Belles and then ruled: "If there are material issues of fact whether the statute of limita-

tions expired as to Concordia Mirror and Glass and Belles and Associates, there are material issues of fact whether the statute of limitations expired as to the architect and general contractor." This is simply an incorrect conclusion, as there is no mention of material issues of fact as to EOAA and no legal or contractual relationship between EOAA and Concordia or Belles upon which this conclusion could be based.

It appears that in analyzing whether the statute of limitations had expired, the district court looked only to paragraphs 12.2.2 and 13.7.1.2 of Newman's contract with the contractors and did not acknowledge the fact that EOAA's contract with Newman contained entirely different language. Newman's contracts were direct with Belles and Concordia and provided in paragraph 13.7.1.3 that as to acts or failures to act occurring after the issuance of the certificate for payment, the statutory limitations period commenced to run

"not later than the date of any act or failure to act by the Contractor pursuant to any warranty provided under Paragraph 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under Paragraph 12.2, or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last."

The above language and paragraphs referred to by the district court are *not* included in or made a part of the contract for architectural services between EOAA and Newman.

We hold the language of Newman's agreements with Walton, Belles, or Concordia has no legal effect on EOAA's arguments concerning the applicability of the statute of limitations. The applicable statute of limitations has run against both of the claims which were tried to the jury in this case unless EOAA is estopped from asserting such a defense as the result of its actions.

## Estoppel

As we have previously stated, Newman argued in its cross-motion for summary judgment below that EOAA and the other defendants should be equitably estopped from asserting a statute of limitations defense due to their continued actions regarding remedial repairs. The district court only found in paragraph 10 of its

ruling that "[t]here is a material issue of fact whether the actions taken by Concordia Mirror and Glass after the date of substantial completion constitutes a waiver, which estops them from relying on the defense of limitations. *Iola State Bank*, 233 Kan. at 458 and 459."

No finding was made that specifically related to EOAA, but in its ruling the district court stated: "[T]here is an issue of material fact whether the movants are estopped from asserting defenses of expiration of the limitation statute." On appeal, EOAA argues it is not estopped from pleading the statute of limitations, contending it took no action that induced delay or inaction and mere negotiations regarding settlement do not result in an estoppel.

Newman did not address this issue in its brief on appeal although it is properly raised by the appellant. In considering this issue, we will look to and consider all the arguments made in Newman's brief on its cross-motion for summary judgment in the district court.

We consider this issue as it is properly raised by EOAA and a remand is not necessary because the record in our case contains sufficient factual information for us to reach a decision. See *Wright v. U.S.D. No. 379*, 28 Kan. App. 2d 177, 14 P.3d 437, *rev. denied* 270 Kan. 904 (2000). Our standard of review is as has been previously set forth.

In discussing equitable estoppel, *Rockers v. Kansas Turnpike Authority*, 268 Kan. 110, 116, 991 P.2d 889 (1999), states:

" 'A party asserting equitable estoppel must show that another party, by its acts, representations, admission, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.' *United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 221 Kan. 523, 527, 561 P.2d 792 (1977).

Each element of estoppel must be proven or the claim will fail. Estoppel will not be held to exist where facts are ambiguous or subject to more than one construction. *Ram Co. v. Estate of Kobbeman*, 236 Kan. 751, Syl. ¶ 5, 696 P.2d 936 (1985).

"Equitable estoppel can be applied to bar a party from relying on the defense of the statute of limitations. Where a defendant has 'by deception or in violation of his duty toward plaintiff, caused him to subject his claim to the statutory bar, defendant must be charged with having wrongfully obtained an advantage . . . and this can be done by his silence when under an affirmative duty to

speak. [Citation omitted.]' *Klepper v. Stover*, 193 Kan. 219, 222, 392 P.2d 957 (1964)."

As was stated in *Coffey v. Stephens*, 3 Kan. App. 2d 596, 599, 599 P.2d 310 (1979), to establish estoppel, plaintiff must prove "some representation or course of conduct which amounts to affirmative inducement sufficient to cause plaintiff to delay bringing the action." The affirmative inducement must have been relied on in good faith by plaintiff. *Coffey*, 3 Kan. App. 2d at 597.

A review of the uncontroverted facts demonstrates Newman failed to establish the requisite elements of estoppel as pertains to the actions of EOAA. In asserting its estoppel argument below, Newman, in its brief, largely refers to the actions of the defendants generally and fails to specify any actions taken by EOAA upon which Newman allegedly relied in delaying filing of this suit.

The district court found that Concordia Glass had represented it would fix window problems under its warranty and sent workers to do remedial work as late as October 1998 and Newman issued work orders to Belles in December 1997 and January 1998, but these findings have nothing to do with EOAA and do not, in any event, support an estoppel.

The uncontroverted facts, at best, tested by the standards of review of summary judgment motions, do show a claim of reliance as to Concordia and/or Walton only. Paragraph 38 of the uncontroverted facts as stated in Newman's cross-motion for summary judgment referenced only those two defendants within the context outlining Newman's decision to take legal action. Paragraph 38 stated:

"The first time Terry Lambert recalls the Board talking about legal action was in 1999 or 2000, but it may have been in 2001 because they kept trying to get a resolution of the problem so Newman Memorial kept thinking that it could get this worked out. Newman Memorial kept discussing it with Concordia and Walton was involved and Newman Memorial kept thinking it was going to get this fixed somehow."

There is mention that EOAA was involved in some discussions regarding remedial repairs but under the *Coffey* test, EOAA's mere involvement in those discussions is grossly insufficient to warrant the application of equitable estoppel to any actions by EOAA. New-

man presented no evidence that EOAA ever requested that Newman delay filing suit against them. In fact, Newman's witness, Lambert, admitted in a deposition that he knew of no promise made to plaintiff to prevent it from filing a lawsuit.

It is clear from the uncontroverted facts that Newman's estoppel claim may have raised triable issues as to other defendants but totally lack any merit when tested against EOAA's actions. The district court erred in finding there was any genuine issue as to a material fact relating to EOAA and its determination as to the existence of equitable estoppel to assert a statute of limitations defense by EOAA is reversed.

There are a multitude of other issues raised by EOAA which we need not reach or consider in light of the result we have reached.

In summary, we hold the actions of Newman in constructing and leasing the medical office building at issue in this case is a proprietary function making Newman subject to the limitations periods prescribed in Article 5 of Chapter 60 of the Kansas Statutes Annotated; equitable estoppel does not exist to prevent EOAA from pleading and relying on the statute of limitations defense; and, the 3-year period of limitations of K.S.A. 60-512(1) and the 5-year period of limitations of K.S.A. 60-511(1) apply to and bar any recovery by Newman under the two theories of recovery, breach of implied warranty of workmanlike performance and breach of a written contract, tried in this case.

The judgment of the district court is reversed, and EOAA is granted judgment against Newman based on its statute of limitations defenses.