(364 P.3d 1213)

No. 112,911

## In the Matter of the Appeal of BHCMC, L.L.C., d/b/a Boot Hill Casino & Resort.

Opinion filed December 31, 2015.

*Jennifer C. Bates*, of Legal Services Bureau, Kansas Department of Revenue, for appellant.

*Michael D. Pospisil* and *Matthew J. Limoli*, of Edgar Law Firm LLC, of Kansas City, Missouri, and *Clinton E. Patty*, of Frieden, Unrein & Forbes LLP, of Topeka, for appellee.

Before STANDRIDGE, P.J., BUSER and SCHROEDER, JJ.

SCHROEDER, J.: The Kansas Department of Revenue (KDOR) appeals the determination that BHCMC, L.L.C. does not owe compensating use tax (use tax) on electronic gaming machines (EGMs) at the Boot Hill Casino & Resort (Boot Hill). The Kansas Board of Tax Appeals (BOTA) found BHCMC was only the manager of Boot Hill, where it uses and operates the EGMs owned by the Kansas Lottery on behalf of the State of Kansas (Kansas Lottery). BOTA found BHCMC had no indicia of ownership in the EGMs for the use tax to be imposed. We agree with BOTA and affirm.

FACTS

*BOTA's Determination*

This appeal arises under the Kansas Compensating Tax Act, K.S.A. 79-3701 *et seq.*, commonly referred to as the "use tax." BHCMC paid use tax in the total amount of $801,588.05 when it bought the EGMs for the Kansas Lottery. The EGMs were purchased from five out-of-state vendors. Each EGM sales agreement identified BHCMC as a purchasing agent and the Kansas Lottery as the owner of the EGMs purchased. After paying the tax under protest, BHCMC applied to the KDOR for a refund, which was denied. BHCMC requested an informal conference for further review of its applications under K.S.A. 2014 Supp. 79-3226(a), and one was held before the hearing officer. The KDOR subsequently revised its determination denying BHCMC's request. BHCMC timely appealed to BOTA.

Following a hearing, BOTA issued a summary decision granting BHCMC's refund application in full. Following a request by the KDOR for a full and complete opinion, BOTA issued a full opinion. Relying on the Kansas Supreme Court's decision in *General Motors Corporation v. State Comm. of Rev. & Taxation,* 182 Kan. 237, 320 P.2d 807 (1958), BOTA concluded BHCMC's use of the EGMs "[was] not incident to their *ownership*," and thus, was

not within the scope of the use tax. The KDOR timely appealed BOTA's decision.

## The Development of Recreational Gambling in Kansas

A little history on the development of recreational gaming in Kansas is necessary here. The statutory authority to gamble in Kansas is controlled by the Kansas Expanded Lottery Act (KELA). See K.S.A. 2014 Supp. 74-8733. Historically, in Kansas, gambling was prohibited under Article 15, § 3 of the Kansas Constitution; however, in 1986, the Constitution was amended to allow limited exceptions for certain bingo games, horse and dog racing, and state-owned and operated lotteries. Kan. Const. art. 15, § 3a, § 3b, § 3c. The Kansas Supreme Court determined "the term lottery, as used in art. 15, § 3 of the Kansas Constitution, has been defined by this court as any game, scheme, gift, enterprise, or similar contrivance wherein persons agree to give valuable consideration for the chance to win a prize or prizes." *State ex rel. Stephan v. Finney*, 254 Kan. 632, 644, 867 P.2d 1034 (1994). "A state-owned lottery . . . means any state-owned and operated game, scheme, gift, enterprise, or similar contrivance wherein a person agrees to give valuable consideration for the chance to win a prize or prizes." *Finney*, 254 Kan. at 656.

Following the constitutional amendment, the Lottery Act, K.S.A. 74-8701 *et seq.*, was passed in 1987. The Lottery Act established the Kansas Lottery, a state-owned and operated independent state agency tasked with the overall management and operation of the state lottery. K.S.A. 2014 Supp. 74-8703(a). In 2007, the Lottery Act was supplemented by the KELA which allowed for the establishment of state-owned and operated lottery facilities. K.S.A. 2014 Supp. 74-8733. The KELA allows the State to contract and delegate the management of the lottery gaming facility; however, it places ultimate ownership and operational control of the lottery game equipment with the Kansas Lottery. See K.S.A. 2014 Supp. 74-8734(h)(17). In order for a KELA-authorized casino to be constitutional, all of the equipment must be state-owned. In demonstrating how the KELA casinos were state-owned and thus constitutional, the Kansas Supreme Court relied on the fact that

the KELA explicitly places "'full, complete and ultimate owner-ship and operational control of the gaming operation of the lottery gaming facility with the Kansas Lottery.' [Citation omitted.] It also provides that the lottery 'shall retain full control over all decisions concerning lottery gaming facility games.' [Citation omitted.]" *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 570, 186 P.3d 183 (2008). To reflect the true nature of ownership of the games, the court found:

"The statutory scheme, when read in its entirety, shows that these direct state-ments of ownership and operational control are not mere verbal camouflage. KELA mandates that the Kansas lottery shall be the licensee and owner of all the software programs used at the lottery gaming facilities for all lottery games. K.S.A. 2007 Supp. 74-8734(n)(1). The games themselves are to be leased or purchased for the Kansas lottery. K.S.A. 2007 Supp. 74-8734(n)(2). Electronic gaming ma-chines will be directly linked to a central lottery communications system to pro-vide monitoring, auditing, and other available program information to the Kansas lottery and will be online and in constant communication with a central computer. K.S.A. 2007 Supp. 74-8749(a)(2), (3). These machines will be subject to deactiva-tion at any time by order of the executive director. K.S.A. 2007 Supp. 74-8749(a) (4). These provisions place ownership and control of key lottery elements squarely in the hands of the Kansas lottery.

. . . .

". . . The payment of gaming revenues directly to the State, the ownership by the State of software licenses, the central monitoring of electronic games, and the authority to enter into management contracts and to supervise the managers con-stitute substantial indicia of ownership by the State and concomitant operation." *Kansas Lottery*, 286 Kan. at 570-72.

## BHCMC's Contract with the Kansas Lottery

BHCMC derives the right to manage Boot Hill through the KELA and the management contract it entered into with the Kan-sas Lottery. The management contract provides BHCMC little or no control over the EGMs, and BHCMC is under stringent su-pervision by the Kansas Lottery. All revenue received is paid daily to the Kansas Lottery, and BHCMC's 73% of the revenue share is then returned to it on a monthly basis.

Under the management contract,

"[BHCMC] must purchase or lease, on behalf of the State of Kansas, for the Kansas Lottery all Lottery Facility Games, including all necessary equipment such

as approved tables, felt, dice, cards, chips, layouts, or intellectual property rights as determined by the Executive Director. [BHCMC] has no authority under this Agreement to own, purchase or lease any Lottery Facility Games, except on behalf of the State of Kansas and through the Kansas Lottery. The Executive Director, in consultation with [BHCMC], will select the Lottery Facility Games to be offered for play at the Lottery Gaming Facility and determine the Prizes to be awarded for the play of such games. The Executive Director will determine and approve all rules of play and gaming policies that are applicable to the play of all Lottery Facility Games offered at the Lottery Gaming Facility."

In compliance with the KELA, the management contract explicitly states "[t]he Kansas Lottery will be the licensee, owner and possessor of the right to use all control software and logic chips required to operate the games available on the Lottery Facility Games at the Lottery Gaming Facility." The management contract gives BHCMC no discretion with respect to the EGMs used in the lottery gaming facility. The Kansas Lottery "has the sole right to own, lease and operate" the EGMs and all software required to operate the EGMs. The "[Kansas] Lottery explicitly retains the power to overrule any action of [BHCMC] affecting the gaming operation without prior notice and the [Kansas] Lottery retains full control over all decisions concerning Lottery Gaming Facility Games." In addition, the Executive Director of the Kansas Lottery is entitled to appoint one or more on-site personnel, reporting directly to him, to oversee the lottery gaming facilities. The extent of the on-site person's authority is reflected by the following conditions contained in the management contract:

"Such person(s) will oversee operations, observe gaming activities, enforce gaming rules and policies, resolve disputes between Manager and Players, and perform such other tasks as directed by the Executive Director. All determinations made by such persons will be subject to review by the Executive Director, provided that Manager may act and rely upon written and verbal determinations made by the Executive Director's on-site personnel until Manager receives written notice from the Executive Director amending or reversing any such determination.

. . . .

"Upon order of the Executive Director, any or all Lottery Facility Games located at the Lottery Gaming Facility will be subject to immediate deactivation and/ or cessation of operation. At any time, the Executive Director will be entitled to physically secure or take possession of any or all Lottery Facility Games and any related equipment necessary to play such games."

In addition to the strict and mandatory provisions of the management contract authorized by K.S.A. 2014 Supp. 74-8734, BHCMC's conduct as the manager is heavily regulated by the KELA as reflected by the Kansas Administrative Regulations (K.A.R.). The appellee directs our attention to the following administrative regulations approved by the Kansas Lottery Commission providing the Kansas Lottery, through the Executive Director, with the exclusive right to control:

- "[W]here EGMs may [be] placed when being stored or repaired (K.A.R. 112-104-26[b]);
- "[T]he procedures the Casino manager must follow each time an EGM is opened (K.A.R. 112-107-1 [2015 Supp.]);
- "[H]ow EGMs must be tested before being used by Casino patrons (K.A.R. 112-107-2 and 112-107-3 [2015 Supp.]);
- "[H]ow EGMs are to be transported in or out of Kansas (K.A.R. 112-107-5 [2015 Supp.]);
- "[W]hether EGMs can be stored outside of the Casino (K.A.R. 112-107-6 [2015 Supp.]);
- "[W]here EGMs are placed on the gaming floor (K.A.R. 112-107-7 [2015 Supp.]);
- "[H]ow EGMs may be tested while on the gaming floor (K.A.R. 112-107-9 [2015 Supp.]);
- "[H]ow EGMs are added to, moved about, or removed from the gaming floor (K.A.R. 112-107-11 [2015 Supp.]); and
- "[H]ow EGMs are to be destroyed (K.A.R. 112-107-32 [2015 Supp.])."

## ANALYSIS

### Does BHCMC owe use tax on the EGMs?

As we seek to answer this question, we acknowledge the controlling statute on the use tax was modified three times during the period of January 2010 to September 2011 in which BHCMC seeks a refund. Interpretation of a statute is a question of law over which appellate courts have unlimited review. *Neighbor v. Westar Energy, Inc.*, 301 Kan. 916, 918, 349 P.3d 469 (2015). The initial statute, K.S.A. 2009 Supp. 79-3703, stated:

"There is hereby levied and there shall be collected from every person in this state a tax or excise *for the privilege of using, storing, or consuming within this state any article of tangible personal property.* Such tax shall be levied and collected in an amount equal to the consideration paid by the taxpáyer multiplied by the rate of 5.3%. . . . *All property purchased or leased within or without this state*

*and subsequently used, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been subject to the Kansas retailers' sales tax had the transaction been wholly within this state."* (Emphasis added.)

The use tax was modified in 2010 and 2011; however, the modifications only involved a change in the percentage tax rate and do not affect the statutory interpretation dispute. See K.S.A. 2011 Supp. 79-3703; K.S.A. 2010 Supp. 79-3703.

K.S.A. 2014 Supp. 79-3702(c) defines "use" as:

"[T]he exercise within this state by any person of any right or power over tangible personal property *incident to the ownership of that property*, except that it shall not include processing, or the sale of the property in the regular course of business, and except storage as hereinafter defined." (Emphasis added.)

The KDOR argues that while the Kansas Lottery actually owns the EGMs located in the gaming facility, BHCMC's purchase of the EGMs was subject to the use tax because:

"[BHCMC] operates the Boot Hill Casino and Resort in accordance with the requirements set forth in the KELA and the Lottery Gaming Facility Management Contract it entered into with the Kansas Lottery. Thus, [BHCMC's] purchase of the EGMs for use at the Boot Hill Casino and Resort must be considered in conjunction with its rights and responsibilities as defined in the KELA and the management contract.
. . . .
"'Ownership' is a bundle of rights—some of which the Kansas Lottery has contractually allowed [BHCMC] to exercise. [Citations omitted.] [BHCMC] is contractually allowed to exercise rights that allow it to use and enjoy the property. Thus, [BHCMC's] exercise of those rights pursuant to the KELA and the management contract satisfies the requirement of use incident to ownership. Here, it is clear that [BHCMC] purchased and took delivery of the EGMs in Kansas with the intent to use them in compliance with the KELA and management contract.
. . . .
"It matters not that the Kansas Lottery ultimately holds title to the EGMs. Securing title to tangible personal property is not and has never been a prerequisite for establishing a taxable use incident to the ownership of that property for purposes of K.S.A. 2012 Supp. 79-3702(c). See *e.g.* K.A.R. 92-19-3a(a)(6) and (i)(5)."

BHCMC responds to the KDOR's position by claiming the Kansas Supreme Court's interpretation of the use tax statute in *General Motors Corporation* reflects its purchase of the EGMs was not subject to the use tax because BHCMC does not own the EGMs.

BHCMC further argues it is prohibited from owning the EGMs pursuant to the Kansas Constitution and Kansas statutes. In *General Motors Corporation*, the Kansas Supreme Court had to determine whether General Motors was subject to an assessment of use tax when General Motors "under contracts with the government, used materials and equipment purchased outside the state in the manufacture of military aircraft for the government in a government-owned aircraft plant." 182 Kan. 237, Syl.

In the early part of 1951, the United States and General Motors entered into two contracts: (1) General Motors was to fabricate a number of airplanes for the United States, and (2) the United States was to furnish General Motors, rent-free, all necessary equipment to enable General Motors to fabricate these airplanes. The appeal arose out of the second contract known as the facilities contract. The court was reviewing a final order of the State Commission of Revenue and Taxation (the Commission) sustaining an assessment of Kansas use taxes made by the Director of Revenue against General Motors Corporation. The district court reversed, vacated, and set aside the assessment. The Commission appealed.

In reviewing the district court's decision, the Kansas Supreme Court found the facilities contract provided that title to all work completed or in the course of completion, and all equipment, material, and parts, whether furnished by the government or General Motors, was vested in the government. *General Motors Corporation*, 182 Kan. at 240. Furthermore, the court found that orders for material and equipment were placed only after government officials concurred in the necessity for the item and the selection of a particular source of supply. The government at all times possessed the complete and absolute right to direct the shipment of all property acquired. At no time was any of the equipment or machinery in question set up on the corporation's books as an asset, and the corporation did not depreciate or amortize any of the machinery or equipment. *General Motors Corporation*, 182 Kan. at 240-41. The court determined "the important factor to be considered is whether the corporation's *use* of the property involved was *incident to its ownership thereof.*" *General Motors Corporation*, 182 Kan. at 243.

In coming to this conclusion, the court was required to interpret the use tax statutes, G.S. 1949, 79-3702 and G.S. 1949, 79-3703. Despite being 66 years ago, the portion of the statute requiring interpretation is unchanged from the current use tax statute. The statute the court interpreted in *General Motors Corporation*, G.S. 1949, 79-3703, reads as follows:

"There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using, storing, or consuming within this state any article of tangible personal property purchased subsequent to June 30, 1945. Such tax shall be levied and collected in an amount equal to the purchase price paid by the taxpayer multiplied by the rate of two percent. All transactions involving compensating tax or use tax prior to July 1, 1945, shall be administered under the law as it exists prior to that date."

The 2014 statute provides:

"There is hereby levied and there shall be collected from every person in this state a tax or excise for the privilege of using, storing, or consuming within this state any article of tangible personal property. Such tax shall be levied and collected in an amount equal to the consideration paid by the taxpayer multiplied by the rate of 6.15%. Within a redevelopment district established pursuant to K.S.A. 74-8921, and amendments thereto, there is hereby levied and there shall be collected and paid an additional tax of 2% until the earlier of: (1) The date the bonds issued to finance or refinance the redevelopment project undertaken in the district have been paid in full; or (2) the final scheduled maturity of the first series of bonds issued to finance the redevelopment project. All property purchased or leased within or without this state and subsequently used, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been subject to the Kansas retailers' sales tax had the transaction been wholly within this state." K.S.A. 2014 Supp. 79-3703.

The words "use" and "storage" are defined in K.S.A. 2014 Supp. 79-3702(c) and (d), and contain the same definition provided in G.S. 1949, 79-3702(c) and (d), except the words in brackets were removed in the 2014 version:

"(c) [The word] 'Use' means [and includes] the exercise within this state by any person of any right or power over tangible personal property *incident to the ownership of that property*, except that it shall not include processing, or the sale of the property in the regular course of business, and except storage as hereinafter defined.

"(d) 'Storage' means [includes] any keeping or retaining [retention] in this state for any purpose except sale in the regular course of business or subsequent use solely outside this state of tangible personal property purchased from a retailer." (Emphasis added.)

The court found General Motors' purchase was not subject to the use tax because

"[f]rom the record it [was] readily apparent that the contracts involved, and the operations under them, were merely the means by which the government purchased the property and equipment for the corporation's use in manufacturing military aircraft for the government in a government-owned aircraft plant. The government owned the property upon entry into the state and continuously thereafter. In the last analysis, the use of such property by the corporation was merely to accomplish the purpose of the owner—the production of military aircraft for the government. Its use of the property was not 'incident to the ownership of that property.'" *General Motors Corporation*, 182 Kan. at 244.

It is readily apparent from the record that the management contract confirms the Kansas Lottery owns the EGMs used by BHCMC in managing Boot Hill, and BHCMC provides the Kansas Lottery with 100% of the gross gambling proceeds on a daily basis. Under the management contract and K.S.A. 2014 Supp. 74-8750(a), BHCMC is required to get the Kansas Lottery's approval for each specific type of EGM used at Boot Hill. BHCMC has no authority to purchase or lease any lottery facility games except on behalf of the Kansas Lottery. K.S.A. 2014 Supp. 74-8734(n)(2). The Kansas Lottery is the licensee, owner, and possessor of the right to use all control software and logic chips required to operate the EGMs. K.S.A. 2014 Supp. 74-8734(n)(1). As previously discussed, the K.A.R.s reflect the strict, comprehensive, and precise control the Kansas Lottery has over BHCMC's management of Boot Hill.

The purchase agreements for the EGMs are all signed by "BHCMC, L.L.C. Manager under contract with the Kansas Lottery on behalf of the State of Kansas." On the purchaser statement page of the contract with Aristocrat Technologies, where the purchaser must sign under penalty of perjury the EGMs will only be used for lawful purposes, the word "purchaser" is crossed out and the BHCMC's Chief Executive Officer signed the statement with a notation the machine "will be used only for lawful purposes, specifically as owned by the Kansas Lottery and operated by the Kansas Lottery pursuant to the Kansas Expanded Lottery Act at the Boot Hill Casino and Resort." In the paperwork submitted to the Nevada State Gaming Control Board for the sale from Aristocrat Technologies, the owner of the EGMs is listed as the State of Kansas. Not only do

the purchase agreements very clearly demonstrate BHCMC purchased the EGMs on behalf of the Kansas Lottery, the KELA is only constitutional if the Kansas Lottery has ultimate ownership and control over the EGMs. See *Kansas Lottery*, 286 Kan. at 570-72. The State of Kansas, through the Kansas Lottery, owned the EGMs as they entered and remain in the state of Kansas.

The KDOR argues *General Motors Corporation* is factually distinguishable because General Motors was reimbursed for the purchase of the materials but BHCMC was not reimbursed for the purchase price of the machines. While this is technically accurate, under the management contract, 100% of the revenues from the gaming facility are paid to the Kansas Lottery on a daily basis. The Kansas Lottery then transfers back 73% of the revenue to BHCMC on a monthly basis as payment for managing the facility. Although reimbursement of the purchase price may take a little longer than it did in *General Motors Corporation*, the concept is almost identical. The EGMs are owned by the State of Kansas and managed by BHCMC to produce income for the State of Kansas.

The KDOR also argues BOTA's reliance on *General Motors Corporation* was misplaced because

"[i]t was decided almost 30 years before the Kansas Lottery Act became law, and almost 50 years before enactment of the KELA. [Citation omitted.] In this case the specific the KELA and the use tax statutes are *in pari materia* and should be construed together. When read together, it is clear that a facility manager uses the facility games its purchases incident to its ownership rights that are exercised as a condition of the management contract."

However, courts generally presume that the legislature acts with full knowledge of existing law. *In re Adoption of H.C.H.*, 297 Kan. 819, 831, 304 P.3d 1271 (2013). When the legislature fails to modify a statute to avoid a standing judicial construction of the statute, we presume the legislature intended the statute to be interpreted as we have done. *Cady v. Schroll*, 298 Kan. 731, 737, 317 P.3d 90 (2014). The Court of Appeals is duty bound to follow Kansas Supreme Court precedent, absent some indication the Supreme Court is departing from its previous position. *Farley v. Above Par Transportation*, 50 Kan. App. 2d 866, 877, 334 P.3d 883 (2014), *rev. denied* 302 Kan. 1009 (2015). There has been no indication

the Kansas Supreme Court is departing from its previous interpretation of the use statute, now K.S.A. 2014 Supp. 79-3703. While the statute was interpreted 66 years ago, the portion of the statute under dispute remains the same today. The use of the EGMs by BHCMC was merely to accomplish the purpose of the owner—the operation of state-owned EGMs in a facility managed for the benefit of the Kansas Lottery with all revenue paid to the Kansas Lottery on a daily basis. BHCMC's use of the EGMs fails to reflect use *incident to the ownership of that property*. BOTA did not err in finding BHCMC's purchase of the EGMs was not subject to the use tax.

Finally, the KDOR argues BHCMC's use of the EGMs is no different than the lease of a vehicle in which the lessee does not hold title but pays sales tax on the lease payment. A lease or rental means:

"[A]ny transfer of possession or control of tangible personal property for a fixed or indeterminate term for consideration. A lease or rental may include future options to purchase or extend." K.S.A. 2009 Supp. 79-3602(r).

BHCMC is not leasing the EGMs from the Kansas Lottery. The comparison of a car lease to this management contract fails. With a car lease, you have some independent control, you can take it anywhere you want to go, you can make small modifications to the car, or you can sell it during the term of the lease. Additionally, you pay sales tax only on the value of the car you are using as reflected by the lease payment, not the entire value of the car as the KDOR is claiming with the EGMs. Here, the Kansas Lottery has the exclusive right to control where the EGMs are placed on the gaming floor and how they are operated, serviced, and transported. All revenue is paid directly to the Kansas Lottery. BHCMC has no independent control over the EGMs.

"Under [the] law the event which gives rise to the tax is the *sale* of tangible personal property at retail, or the rendering or furnishing certain services. The law is framed, and has been construed, so that the transaction which is taxed is that by which a commodity moves to the ultimate consumer, whoever he may be." *General Motors Corporation*, 182 Kan. at 242-43.

The Kansas Lottery is the ultimate consumer, not BHCMC. BHCMC is not subject to the compensating use tax.

Affirmed.