IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 112,911

In the Matter of the Appeal of BHCMC, L.L.C., d/b/a BOOT HILL CASINO & RESORT.

SYLLABUS BY THE COURT

1.

Under K.S.A. 2016 Supp. 79-3702(c), to "use" property a taxpayer must "exercise within this state . . . any right or power over tangible personal property incident to the ownership of that property." This language is ambiguous. It may or may not require that the user or taxpayer be the owner. This ambiguity must be read to favor the taxpayer. In addition, the taxpayer must have exercised a right or power incident to ownership of the property, otherwise, the taxpayer has not used property, as "use" is defined in K.S.A. 2016 Supp. 79-3702(c), and is not subject to the Kansas compensating use tax under K.S.A. 2016 Supp. 79-3703.

Review of the judgment of the Court of Appeals in 52 Kan. App. 2d 232, 364 P.3d 1213 (2015). Appeal from Board of Tax Appeals. Opinion filed December 29, 2017. Judgment of the Court of Appeals affirming the Board of Tax Appeals is affirmed. Judgment of the Board of Tax Appeals is affirmed.

*John Michael Hale*, of Kansas Department of Revenue, argued the cause, and *Jennifer C. Bates*, of the same agency, was on the brief for appellant.

*Matthew J. Limoli*, of Edgar Law Firm LLC, of Kansas City, Missouri, argued the cause, and *Michael D. Pospisil,* of the same firm*, and *Clinton E. Patty*, of Frieden, Unrein & Forbes LLP, of Topeka, were with him on the brief for appellee.

The opinion of the court was delivered by

BEIER, J.: In this appeal from a Board of Tax Appeals summary decision granting a compensating use tax refund to BHCMC, L.L.C., doing business as Boot Hill Casino & Resort, we address whether such a tax can be imposed on Boot Hill for electronic gaming machines it does not—and, under the law and its management agreement with Kansas Lottery, cannot—own.

We hold that Boot Hill did not exercise a right or power incident to ownership of personal property in order to be subject to a compensating use tax for that property. Because Boot Hill has not exercised such a power or right, we affirm BOTA's refund and the Court of Appeals panel decision that upheld it.

FACTUAL AND PROCEDURAL BACKGROUND

Boot Hill challenges its payment of $801,588.95 in compensating use tax for the years 2009 through 2011. The amount assessed was based on the sale price for electronic gaming machines (EGMs) that Boot Hill purchased out of state for use at the casino it manages in Dodge City.

The casino/resort is divided into "Lottery Gaming" facilities and operations and "Ancillary Lottery Gaming" facilities and operations. The "Lottery Gaming" label applies to the gaming floor and its operations, whereas the "Ancillary Lottery Gaming" label applies to the rest of the property and its operations, including, for example, a restaurant. Boot Hill owns the Ancillary Lottery Gaming facilities and operations. The State of Kansas, through the Kansas Lottery, owns the Lottery Gaming facilities and operations. Boot Hill manages the Lottery Gaming facilities and operations for the State under a "Lottery Gaming Facility Management Agreement," which provides in pertinent part:

2

"1. Certain Defined Terms. . . .

. . . .

"g) 'Electronic Gaming Machine' [EGM] means any electronic, electromechanical, video or computerized device, contrivance or machine authorized by the Kansas Lottery which . . . is available to play, operate or simulate the play of a game authorized by the Kansas Lottery pursuant to the Kansas Expanded Lottery Act. . . . Electronic Gaming Machines are one type of Lottery Facility Games.

. . . .

"j) 'Gray Machine' means any mechanical, electro-mechanical or electronic device, available to the public for play that is capable of being used for gambling, that is: (1) not authorized by the Kansas Lottery; (2) not linked to the lottery central computer system as required by the Kansas Expanded Lottery Act; or (3) capable of simulating a game played on an Electronic Gaming Machine or any similar gambling game authorized pursuant to the Kansas Expanded Lottery Act.

. . . .

"6. Manager's Representations and Warranties. . . .

. . . .

"l) Manager will comply with all applicable rules and regulations imposed now, or in the future, by Kansas Lottery.

3

. . . .

"n) Manager acknowledges and agrees the State of Kansas, acting through the Commission and the Kansas Lottery, pursuant to their statutory authority, has the sole right to own, lease and operate the Lottery Facility Games placed at the Lottery Gaming Facility and has the full, complete and ultimate ownership and operational control of the gaming operation of the Lottery Gaming Facility. Manager further acknowledges and agrees the Lottery explicitly retains the power to overrule any action of Manager affecting the gaming operation without prior notice and the Lottery retains full control over all decisions concerning Lottery Gaming Facility Games. No Gray Machines will be permitted at the Lottery Gaming Facility.

. . . .

"16. Exclusive Use of Lottery Gaming Facility. The Lottery Gaming Facility will be used exclusively for the playing of Lottery Facility Games owned and operated by the Kansas Lottery, and the ancillary management activities approved by the Executive Director, which may include beverage service, food service, and ATM facilities. Manager may not permit any other business activities within the Lottery Gaming Facility unless approved in writing by the Executive Director.

. . . .

"21. Lottery Facility Game Ownership. The Manager must purchase or lease, on behalf of the State of Kansas, for the Kansas Lottery all Lottery Facility Games, including all necessary equipment such as approved tables, felt, dice, cards, chips, layouts, or intellectual property rights as determined by the Executive Director. Manager has no authority under this Agreement to own, purchase or lease any Lottery Facility Games, except on behalf of the State of Kansas and through the Kansas Lottery. The Executive Director, in consultation with Manager, will select the Lottery Facility Games to be offered for play at the Lottery Gaming Facility and determine the Prizes to be

4

awarded for the play of such games. The Executive Director will determine and approve all rules of play and gaming policies that are applicable to the play of all Lottery Facility Games offered at the Lottery Gaming Facility.

"22. Control Software Licensing and Ownership. The Kansas Lottery will be the licensee, owner and possessor of the right to use all control software and logic chips required to operate the games available on the Lottery Facility Games at the Lottery Gaming Facility. This includes: (a) any software, hardware, computer chip, EPROMS (erasable, programmable, read-only memory), flash drives, CD-ROM or other computerized device required to operate the games available for play on the Lottery Facility Games, (b) any software, hardware, computer chip, EPROMS (erasable, programmable, read-only memory), flash drives, CD-ROM or other computerized device containing information regarding or affecting a Lottery Facility Game's chance of winning, awarding of prizes, or setting the consideration paid by a Player, such as the random number generator or payout tables; (c) CPUs and other electronic components involved in the operation and calculation or display of game play (e.g., game controller electronics and components housing the game or system firmware program storage media or EPROMS); or (d) communication controller electronics, and components housing the communication control program that is used for communicating financial data, program information and security events to the central computer authorized by the Executive Director for purposes of security, real-time monitoring and auditing, as well as ticket validation and any other system used that affects the integrity of the Lottery Facility Games made available to Players at the Lottery Gaming Facility. Manager will transfer to the Kansas Lottery any rights obtained by Manager to use all control software and logic chips required to operate the games available on the Lottery Facility Games available to Players at the Lottery Gaming Facility. The Executive Director must approve all agreements concerning software licensing and ownership affecting the Lottery Facility Games made available to Players at the Lottery Gaming Facility.

"23. Daily Electronic Payment of Lottery Gaming Facility Revenues. Manager must pay all Lottery Gaming Facility Revenues daily to the Executive Director as provided by applicable regulation. Manager will make this payment electronically in accordance with the Executive Director's written instructions, which will conform to

5

necessary banking practices. These instructions may be changed from time to time in the Executive Director's sole discretion with reasonable notice to Manager. The Executive Director, in consultation with Manager, will develop a process so that Manager may audit and reconcile Lottery Gaming Facility Revenues after the daily payments are made. Notwithstanding any other provision in this Agreement, Manager's failure to make a daily electronic payment of Lottery Gaming Facility Revenues as required by this Agreement will be deemed an event of default unless the payment cannot be achieved due to the unavailability of bank services, force majeure events, or malfunctions in the central communications system not within Manager's control in which case the payment must be made on the first succeeding day that such services are available or such events or malfunctions cease. Manager's failure to comply with this paragraph will authorize the Executive Director in his sole discretion to immediately terminate this Agreement if Manager does not cure its failure within 24 hours of receiving written notice of Manager's failure to comply, provided that Manager's failure to make the required daily payment is not intentional.

. . . .

"33. Deactivation and Possession of Lottery Facility Games. Upon order of the Executive Director, any or all Lottery Facility Games located at the Lottery Gaming Facility will be subject to immediate deactivation and/or cessation of operation. At any time, the Executive Director will be entitled to physically secure or take possession of any or all Lottery Facility Games and any related equipment necessary to play such games.

. . . .

"52. Surrender Upon Termination. At the Executive Director's request, Manager agrees that at the expiration or earlier termination of this Agreement, Manager will deliver to the Executive Director, or his designee, all books, records, accounting documents, [etc.] concerning all equipment relating to the Lottery Facility Games . . . If, at the termination of this Agreement, there are any Lottery Facility Games that were purchased by Manager on behalf of the Kansas Lottery with ownership transferred to the

6

Kansas Lottery, then the Executive Director will transfer ownership of such games to Manager or Manager's designee, if such transfer is lawful; but if such transfer is not lawful, then the Executive Director will refund to Manager the residual value received by the Executive Director in a sale of such game to an eligible buyer.

. . . .

"74. No Joint Venture Created. Manager and the Kansas Lottery agree and acknowledge that by entering into this Agreement they are not entering into a joint venture."

This ownership and operations arrangement is required by Kansas law. In order for casino gambling to be legal, a casino must be owned and operated by the State of Kansas. See *State ex rel. Six v. Kansas Lottery*, 286 Kan. 557, 570, 186 P.3d 183 (2008) (upholding Kansas Expanded Lottery Act [KELA]); see also Kan. Const. art. 15, § 3 ("Lotteries and the sale of lottery tickets are forever prohibited."); Kan. Const. art. 15, § 3c ("the legislature may provide for a state-owned and operated lottery"); K.S.A. 2016 Supp. 74-8733 et seq. (KELA; authorizing operation of certain gaming facilities, electronic gaming machines, other lottery games at certain locations). "KELA explicitly places 'full, complete and ultimate ownership and operational control of the gaming operation of the lottery gaming facility with the Kansas lottery.' K.S.A. 2007 Supp. 74-8734(h)(17)." *Kansas Lottery*, 286 Kan. at 570.

"The statutory scheme, when read in its entirety, shows that these direct statements of ownership and operational control are not mere verbal camouflage. . . . The games themselves are to be leased or purchased for the Kansas lottery. K.S.A. 2007 Supp. 74-8734(n)(2). Electronic gaming machines will be directly linked to a central lottery communications system to provide monitoring, auditing, and other available program information to the Kansas lottery and will be online and in constant communication with a central computer. K.S.A. 2007 Supp. 74-8749(a)(2), (3). These machines will be subject to deactivation at any time by order of the executive director.

7

K.S.A. 2007 Supp. 74-8749(a)(4). These provisions place ownership and control of key lottery elements squarely in the hands of the Kansas lottery.

"The games themselves will all be purchased or leased for the Kansas lottery, and the games will be subject to the ultimate control of the Kansas lottery. K.S.A. 2007 Supp. 74-8734(n)(2). The Kansas lottery must approve each specific type of electronic gaming machine and lottery facility game. K.S.A. 2007 Supp. 74-8750(a). The Executive Director of the Racing and Gaming Commission must issue a certificate approving the use of any electronic gaming machine or lottery facility game before the machine or game may be operated. K.S.A. 2007 Supp. 74-8750(b)." 286 Kan. at 570-71.

The management agreement between Boot Hill and the Kansas Lottery is designed to ensure that both parties comply with the Kansas Constitution and KELA. For example, as detailed in the language quoted above, Boot Hill is required to purchase all lottery games, but it does so only on behalf of the State. Boot Hill is expressly prohibited from "own[ing], purchas[ing,] or leas[ing] any Lottery Facility Games, except on behalf of the State of Kansas and through the Kansas Lottery."

Because Kansas Lottery is the actual owner and operator of the electronic gaming machines at issue here, Boot Hill argued to the Kansas Department of Revenue that it did not owe the compensating use tax for EGMs purchased out of state in 2009 through 2011. In a Final Determination issued on February 3, 2014, the Department rejected Boot Hill's argument and denied its refund request.

Boot Hill appealed to BOTA. After hearing argument and reviewing the evidence, BOTA issued its opinion, making the following findings:

"BHCMC manages the Boot Hill Casino and Resort located in Dodge City, Kansas. BHCMC owns the premises at 4000 W. Comanche in Dodge City, Kansas[,] upon which the Boot Hill Casino and Resort was built. BHCMC owns the ancillary

8

gaming facility operations, i.e. everything outside of the gaming floor, but the Kansas Lottery owns the gaming facility, i.e. everything on the gaming floor. BHCMC's rights and responsibilities as manager are dictated by KELA and its Lottery Gaming Facility Management Agreement ('Lottery Agreement'). The Lottery Agreement provides that the lottery gaming facility is 'owned and operated by the Kansas Lottery,' as required by the Kansas Constitution and KELA. Likewise, the Kansas Lottery owns the electronic gaming machines ('EGMs'). K.S.A. 74-8734(h)(17). All revenue derived from the EGMs is deposited with the Kansas Lottery.

"BHCMC receives compensation for managing the gaming facility in the amount of 73% of all revenues generated in the gaming facility, which includes the revenue generated by the EGMs. BHCMC pays the expenses incurred by the Kansas Lottery and the Kansas Racing and Gaming Commission for their oversight and regulation of the gaming facility. BHCMC has contractually agreed to purchase the EGMs for the Kansas Lottery, to maintain and repair the EGMs, and to maintain insurance against loss or damage of the EGMs.

"The Agreement requires the Kansas Lottery be the owner and licensee of all software required to operate the EGMs, gives the Kansas Lottery the right to immediately deactivate and take possession of all EGMs at any time without prior notice to BHCMC, and reiterates that 'the Kansas Lottery maintains at all times full control over all decisions' concerning the EGMs.

"The Kansas Lottery's control over the EGMs is further augmented through Kansas Administrative Regulations promulgated pursuant to K.S.A 74-8748. Pursuant to the regulations, the Kansas Lottery has the exclusive right to control where the EGMs may be placed when being stored or repaired (K.A.R 112-104-26(b)); what procedures the manager must take each time an EGM is opened (K.A.R. 112-107-1); how EGMs must be tested before being used by patrons (K.A.R. 112-107-2 and K.A.R. 112-107-3); how EGMs are transported into or out of the state of Kansas (K.A.R. 112-107-5); whether EGMs can be stored outside the gaming facility (K.A.R. 112-107-6); where EGMs are placed on the gaming floor (K.A.R. 112-107-7); how EGMs may be tested while on the gaming floor (K.A.R. 112-107-9); how EGMs are added to, moved about, or

9

removed from the gaming floor (K.A.R. 112-107-11); and how EGMs are to be destroyed (K.A.R. 112-107-32).

> "The Agreement required BHCMC to pay for the EGMs 'on behalf of the State of Kansas, for the Kansas Lottery.' The EGMs were purchased from five separate vendors. Each sales agreement identified BHCMC as the purchasing agent and the Kansas Lottery as the owner of the EGMs purchased. BHCMC paid use taxes in the total amount of $801,588.95 on the EGM purchases. On each use tax return, BHCMC expressly stated that it was paying the tax under protest."

BOTA distinguished Boot Hill's "use" of the machines in the everyday sense of the word from the "use" contemplated by the applicable statutory definition:

> "Although under common usage of the term 'use' BHCMC may *use* the EGMs to some degree in its business endeavors as a gaming facility manager, the Board concludes that BHCMC's use of the EGMs is not incident to their *ownership*. The direct statements of ownership in the statute and agreements clearly place ownership of the EGMs in the Kansas Lottery. As a result, BHCMC's use of the EGMs is not incident to the ownership of the property as required by K.S.A. 79-3702(c) and K.S.A. 79-3703 to impose the use tax."

In BOTA's view, all of this meant that Boot Hill was "not liable for use tax because it does not make use incident to ownership of the EGMs."

The Department appealed BOTA's decision to the Court of Appeals, and the panel affirmed. See *In re Tax Appeal of BHCMC, L.L.C.*, 52 Kan. App. 2d 232, 364 P.3d 1213 (2015). Relying on this court's decision in *General Motors Corporation v. State Comm. of Rev. & Taxation*, 182 Kan. 237, 320 P.2d 807 (1958), the panel held that Kansas Lottery's status as the "ultimate consumer" owning the EGMs meant that Boot Hill was not subject to the compensating use tax. *BHCMC*, 52 Kan. App. 2d at 243-44.

10

We granted the Department's petition for review.

DISCUSSION

Decisions of BOTA are subject to review under the Kansas Judicial Review Act (KJRA). See *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016); K.S.A. 2015 Supp. 74-2426(c). The KJRA establishes the standard of review for appeals from state administrative agency decisions. The Department argues that BOTA's decision to grant the refund flowed from its erroneous interpretation and application of the governing law and that its decision was otherwise unreasonable, arbitrary, or capricious. See K.S.A. 2016 Supp. 77-621(c)(4), (8) (permitting reversal of agency action by a court on such grounds).

At the heart of the Department's challenge is the language of K.S.A. 2016 Supp. 79-3703, which imposes the compensating use tax, and the definition of "use" in K.S.A. 2016 Supp. 79-3702(c). Issues of statutory interpretation and construction raise questions of law subject to de novo review. *Norris v. Kansas Employment Security Bd. of Review*, 303 Kan. 834, 837, 367 P.3d 1252 (2016). An appellate court first engages in statutory interpretation of the legislature's plain language; statutory construction using canons, legislative history, and other background considerations is unnecessary if an enactment's language is clear and unambiguous. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). Specifically, in this area of the law, if construction is necessary "'statutes that impose the tax are to be construed strictly in favor of the taxpayer.'" *In re Tax Appeal of Sprint Communications Co., L.P.*, 278 Kan. 690, 695, 101 P.3d 1239 (2004) (quoting *In re Tax Exemption Application of Central Illinois Public Services, Co.*, 276 Kan. 612, 616, 78 P.3d 419 [2003]).

A compensating use tax such as that arising under the Kansas Compensating Tax Act, K.S.A. 79-3701 *et seq.*, can be understood as complementary to a sales tax. See

11

*General Motors*, 182 Kan. at 243 ("the necessity for a 'use' tax arose from the fact that a state is without power to tax sales which are completed beyond its territorial limits"). In contrast to a sales tax, for which the sale of an item is the taxable event, the Kansas compensating use tax is pegged to the use, storage, or consumption of property within the state. 182 Kan. at 243. A compensating use tax generally is imposed on property brought into the taxing authority's jurisdiction. See Black's Law Dictionary 1688 (10th ed. 2014) (use tax:  "A tax imposed on the use of certain goods that are bought outside the taxing authority's jurisdiction.").

K.S.A. 2016 Supp. 79-3703 imposes a compensating use tax on

"every person in this state . . . for the privilege of *using*, storing, or consuming within this state any article of tangible personal property. . . . All property purchased or leased within or without this state and subsequently *used*, stored or consumed in this state shall be subject to the compensating tax if the same property or transaction would have been subject to the Kansas retailers' sales tax had the transaction been wholly within this state." (Emphases added.)

K.S.A. 2016 Supp. 79-3702(c) defines "use" as "the exercise within this state by any person of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include processing, or the sale of the property in the regular course of business, and except storage as hereinafter defined." (Emphasis added.) In addition, under K.S.A. 79-3703a, evidence that personal property was sold for delivery in the state is prima facie evidence that the property was sold for use in the state. The parties do not dispute that the electronic gaming machines at issue were purchased outside of Kansas for delivery in Kansas.

This court previously addressed the meaning of an earlier codification of the "use" definition in *General Motors*.

12

In 1951, General Motors Corporation entered into a contract with the United States government, to manufacture aircraft at a government-owned plant in Kansas City, Kansas. Litigation arose over whether General Motors owed use tax for machinery and equipment purchased out of state but used in Kansas in connection with the planes' production. The State Commission of Revenue and Taxation sustained a tax assessment against General Motors. General Motors appealed to the district court.

The district judge made several explicit factual findings about the relationship between General Motors and the government: The parties' contract required General Motors to manufacture a number of airplanes for the government while the government would furnish General Motors, rent-free, all equipment necessary for the task. The equipment came from either the government's stockpile of machinery or purchases made by General Motors. The State sought to tax General Motors on equipment purchased by General Motors but not equipment that came from the stockpiles. Any purchases made by General Motors were authorized by the government officers in charge of the project, transported on government bills of lading, immediately tagged on receipt as property of the U.S. Air Force, and recorded as government-owned. General Motors initially paid for the equipment with its own funds, but it was promptly reimbursed by the government upon submission of required vouchers.

The district judge also found that, after purchase, the government controlled the equipment. The government was free to divert the equipment from General Motors to other plants, regardless of whether the equipment had already been delivered to Kansas City. The equipment was not listed as an asset on General Motors' books, and General Motors took no depreciation or amortization. General Motors also did not carry insurance on the equipment. The district court's factual findings concluded with: "'The equipment involved was purchased outside Kansas, and became U.S. property immediately after

13

purchase; General Motors exercised no claim of ownership to said equipment and at no time owned same.'" 182 Kan. at 239.

Based on these factual findings, the district judge drew several conclusions of law, including that the government was the purchaser of the equipment and was vested with full ownership of it. The government was the "'user, storer or consumer'" of the property within the meaning of the Kansas Compensating Tax Act. In contrast, General Motors was merely a bailee in whose trust the property was placed to accomplish the purposes of the bailor, the government. General Motors exercised no privilege of use, storage, or consumption. Because of this arrangement, General Motors was not liable for any tax for use of the property within Kansas.

When the case reached this court, our predecessors began their legal analysis by setting out the relevant definitional statute. Under what was then G.S. 1949, 79-3702(c), the word "use" was defined as "'the exercise within this state by any person of any right or power over tangible personal property incident to the ownership of that property, except that it shall not include processing, or the sale of the property in the regular course of business, and except storage as hereinafter defined.'" *General Motors*, 182 Kan. at 242. This language is identical to that still in use and at issue today. See K.S.A. 2016 Supp. 79-3702(c).

This court ultimately affirmed the district's court's decision, holding that General Motors had not used the property as "use" was defined by the statute. This court specifically relied on the district judge's finding that the "equipment involved was purchased outside Kansas, and became U.S. property immediately after purchase; General Motors exercised no claim of ownership to said equipment, and at no time owned same." 182 Kan. at 239. The court emphasized the definition's inclusion of the phrase "incident to the ownership" of the property, but ultimately placed heavy reliance

14

on a slight but significant variation of it: "[T]he important factor to be considered is whether the corporation's use of the property involved was incident to *its* ownership thereof." (Emphasis added.) 182 Kan. at 243.

The *General Motors* court distinguished the situation before it from facts examined in earlier caselaw, focusing especially on *Boeing Airplane Co. v. State Commission of Revenue and Taxation*, 153 Kan. 712, 113 P.2d 110 (1941). "In the *Boeing* case the government did not own the property at the time liability for the tax arose." *General Motors*, 182 Kan. at 243. The government had agreed to reimburse Boeing for purchasing the property, but ultimate transfer of the entire ownership interest in the property was not guaranteed. Boeing had multiple options it could exercise within a 5-year period to realize permanent ownership. As the *General Motors* court noted, "in the meantime the property was owned by Boeing and it was not known whether it would ever lose that ownership." 182 Kan. at 243-44. Thus Boeing was not exempt from the compensating use tax.

The *General Motors* court concluded:

"From the record it is readily apparent that the contracts involved, and the operations under them, were merely the means by which the government purchased the property and equipment for the corporation's use in manufacturing military aircraft for the government in a government-owned aircraft plant. The government owned the property upon entry into the state and continuously thereafter. In the last analysis, the use of such property by the corporation was merely to accomplish the purpose of the owner— the production of military aircraft for the government. Its use of the property was not 'incident to the ownership of that property.'" 182 Kan. at 244.

In this case, throughout the parties' briefs, in the Court of Appeals, and during oral argument before this court, ownership of the EGMs rather than exercise of a right or power incident to ownership of the EGMs has been framed as the only possible

15

dispositive question. We thus address first whether the taxpayer must be the owner of the property in order to be taxed for its use within the state.

K.S.A. 2016 Supp. 79-3703 imposes a tax on every *person* who "uses," stores, or consumes tangible personal property within the state. This section is silent on whether the taxpayer must also be the owner of the tangible personal property. But that does not end our inquiry. We must also look to the section defining "use."

On its surface, the definitional section is similarly silent on the ownership status of the taxpayer. To constitute "use," the statute simply requires that "any *person*" exercise a right or power over tangible personal property. (Emphasis added.) See K.S.A. 2016 Supp. 79-3702(c). But broad applicability to non-owners is at least questionable. The statute also requires that the "right or power" be "*incident to the ownership of that property*." (Emphasis added.) K.S.A. 2016 Supp. 79-3702(c).

When used as an adjective, "incident" is commonly defined as "likely to happen as a result or concomitant; incidental (to)." Webster's New World College Dictionary 735 (5th ed. 2016) (e.g., "the cares *incident* to parenthood"). When used as a noun, "concomitant" is defined as "an accompanying or attendant condition, circumstance, or thing." Webster's New World College Dictionary 309 (5th ed. 2016). In legal contexts, the adjective "incident" is defined as:  "Dependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." Black's Law Dictionary 879 (10th ed. 2014).

In light of these definitions, for a person to exercise a right or power over property *incident* to the ownership of that property, it may follow that the person exercising the right or power is also the owner of the property. We acknowledge, however, that reasonable minds could differ on this interpretation of the statute. The potential for that

16

disagreement renders the statute ambiguous. *State v. Paul*, 285 Kan. 658, 661-62, 175 P.3d 840 (2008) (statute ambiguous if contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language, and leaves us generally uncertain which one of the two or more meanings is the proper meaning").

As noted above, any statutory ambiguity must be resolved in favor of the taxpayer. See *Sprint Communications*, 278 Kan. at 695. This means we must read the current language of the statute to impose more, rather than fewer, requirements for imposition of the tax. Thus, consistent with the *General Motors* court's intuitive use of the word "its" before "ownership," Boot Hill must have been the owner of the property at issue.

Such ownership is a necessary condition but not the only condition for imposition of the tax. Under K.S.A. 2016 Supp. 79-3702(c), the taxpayer must also exercise a right or power incident to that ownership within the state. Boot Hill meets neither condition.

As noted in Black's Law Dictionary, "[i]t is common to describe property as a 'bundle of rights.' These rights include the right to possess and use, the right to exclude, and the right to transfer." Black's Law Dictionary 1410 (10th ed. 2014); see also Black's Law Dictionary 1517 (10th ed. 2014) ("right" is "power, privilege, or immunity secured to a person by law"); Black's Law Dictionary 1358 (10th ed. 2014) ("power": "The legal right or authorization to act or not act; a person's or organization's ability to alter, by an act of will, the rights, duties, liabilities, or other legal relations either of that person or of another.").

The constitutional, statutory, and regulatory legal framework necessarily governing casino ownership and operation in Kansas and the entirely consistent provisions of the management agreement in the record before us persuade us that Boot

17

Hill is not the owner of the EGMs, and it has not used them within the meaning of the statute.

As BOTA observed in its findings of fact, Boot Hill owns "the ancillary gaming facility operations, i.e. everything outside of the gaming floor, but the Kansas Lottery owns the game facility, i.e. everything on the gaming floor." With respect to EGMs, Boot Hill agreed to purchase, maintain and repair, and maintain insurance coverage on the EGMs. But, when Boot Hill purchased the EGMs "on behalf of the State of Kansas, for the Kansas Lottery," each sales agreement identified Boot Hill as the purchasing agent and the Kansas Lottery as the owner of the EGMs purchased. Under the management agreement, the Kansas Lottery is required to be the owner and licensee of all software required to operate the EGMs. The Kansas Lottery retains the right to deactivate and take possession of all EGMs at any time without prior notice to Boot Hill. The agreement "reiterates that 'the Kansas Lottery maintains at all times full control over all decisions' concerning the EGMs." As compensation for managing the gaming facility, Boot Hill receives 73% of all revenues generated in the gaming facility. But as noted in *Kansas Lottery*, before Boot Hill receives the revenue, the income first flows to the State of Kansas and the proceeds are then distributed by the State. See 286 Kan. at 571.

In short, the State, through the Kansas Lottery, is the owner of the EGMs, and it maintains and exercises all rights and powers incident to that ownership. Kansas Lottery's approval is required for virtually all operational decisions related to the EGMs. Its express retention of the right to deactivate or take possession of the EGMs at any time and without notice further demonstrates its continued sole right to "possess and use, . . . to exclude, . . . and to transfer" the EGMs. Just as the federal government retained all rights and powers incident to ownership of the equipment at issue in *General Motors*, the State retains all rights and powers incident to ownership of the EGMs at issue here.

18

Under these facts, Boot Hill cannot be subject to the Kansas compensating use tax on the EGMs as a matter of law.

Before concluding, we pause briefly to address three other arguments raised by the Department, lest our silence be misinterpreted as inattention. We have not only noted the inclusion of these arguments; we regard their inclusion as a useful catalyst for a teaching moment. They are classic examples of things better left unsaid on appeal because their profound weaknesses dilute the Department's ability to persuade.

First, in its briefs and at oral argument, the Department has attempted to persuade us to construe K.S.A. 2016 Supp. 79-3703 against Boot Hill, characterizing the statute as a refund provision. See *In re Tax Appeal of Ford Motor Credit Co.*, 275 Kan. 857, 861, 69 P.3d 612 (2003) ("refund provisions are construed strictly against the entity seeking a refund"). This argument is wholly without merit. The nature of the statutory provision at issue, not the procedural posture of a particular case, determines the direction of any strict construction we must apply. Boot Hill's demand for a refund is based on its argument that the language in K.S.A. 2016 Supp. 79-3703, as defined by K.S.A. 2016 Supp. 79-3702(c), does not cover its situation. This argument has required us to examine a taxing provision, not a refund provision. See *Sprint Communications*, 278 Kan. at 695.

Second, BOTA concluded that Boot Hill's "*use* of the EGMs" was not incident to their ownership. BOTA's casual employment of the word "use" in this passage prompted pursuit of another argument tangent by the Department, which insisted that BOTA concluded as a matter of law that Boot Hill "used" the EGMs under K.S.A. 2016 Supp. 79-3702(c). It is obvious that this passage was not BOTA's ruling; indeed, its 10-page decision made clear that its holding was exactly the opposite.

19

Finally, at oral argument, the Department asked that we look at the signatures on the purchasing agreements between the EGM vendors and Boot Hill. According to the Department, because there was no signature by a representative of the State on the agreement, the agreements were evidence that Boot Hill owned the EGMs at purchase and then transferred the machines to the Kansas Lottery after they had been moved into the state. It is true that Boot Hill's president signed the agreements and not someone from the State. But, again, the language of the agreements themselves could not be more clear or more adverse to the Department's position.

CONCLUSION

For all of the reasons set forth above, we affirm the refund of the Board of Tax Appeals and the Court of Appeals panel's decision upholding it.

BILES, J., not participating.

THOMAS M. SUTHERLAND, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** District Judge Sutherland was appointed to hear case No. 112,911 vice Justice Biles under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.